**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MARY GROGAN, derivatively on behalf of BIOVENTUS INC., | |
|       Plaintiff, | C.A. No.: _____ |
|       vs. | |
| KENNETH M. REALI, MARK L. SINGLETON, GREGORY O. ANGLUM, SUSAN M. STALNECKER, WILLIAM A. HAWKINS, PATRICK J. BEYER, PHIL COWDY, MARY KAY LADONE, MICHELLE MCMURRY HEATH, GUIDO J. NEELS, GUY P. NOHRA, DAVID J. PARKER, and MARTIN P. SUTTER, | DEMAND FOR JURY TRIAL |
|       Defendants, | |
|       and | |
| BIOVENTUS INC., | |
|       Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

Plaintiff Mary Grogan ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Bioventus Inc. ("Bioventus" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Kenneth M. Reali ("Reali"), Mark L. Singleton ("Singleton"), Gregory O. Anglum ("Anglum"), Susan M. Stalnecker ("Stalnecker"), William A. Hawkins ("Hawkins"), Patrick J. Beyer ("Beyer"), Phil Cowdy ("Cowdy"), Mary Kay Ladone ("Ladone"), Michelle McMurry Heath ("Heath"), Guido J. Neels ("Neels"), Guy P. Nohra ("Nohra"), David J. Parker ("Parker"), and Martin P. Sutter ("Sutter") (together, the "Individual Defendants," and collectively with Bioventus, "Defendants") for

1

breaches of fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); and against Defendants Reali, Singleton, Anglum, and Stalnecker for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and section 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Bioventus, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Bioventus's directors and officers from February 11, 2021 through March 30, 2023, both dates inclusive (the "Relevant Period").

2.      Bioventus is a medical device company that focuses on "cost efficient and minimally invasive treatments that engage the body's natural healing process." The Company's products are split into three "verticals": Pain Treatments, which covers non-surgical joint pain injection therapies as well as peripheral nerve stimulation products; Surgical Solutions, which covers bone graft substitutes to fuse and grow bones; and Restorative Therapies, which covers a bone healing system and skin allografts.

3.     Of these three verticals, Pain Treatments offers the largest source of revenue for Bioventus. Indeed, sales of hyaluronic acid ("HA") injections to treat knee osteoarthritis accounted for more than fifty percent of Bioventus's revenue from 2018 to 2021 and accounted for forty-two percent of revenue in 2022.

4.     When Bioventus became a public company through an initial public offering ("IPO") in February 2021, the Company admitted in its registration statement filed on Form S-1 with the SEC (the "Registration Statement") that it was "highly dependent on a limited number of products, " namely, its HA injections, and that "our ability to execute our growth strategy and maintain profitability will depend upon the continued demand for these products."

5.     Putting additional pressure on the success of these products, and soon after Bioventus received new funds from the IPO, Defendants engaged in three separate acquisitions which heavily indebted the Company to the tune of $360 million. First, the Company acquired Bioness, a healthcare company focused on rehabilitation therapies, in March 2021 for $48.8 million in cash. The Bioness deal required Bioventus to pay an additional $50 million in cash by the close of 2024 or the beginning of 2025 to Bioness if certain contingencies were met. Then, Bioventus acquired Misonix, Inc., a healthcare company focused on ultrasonic technology and regenerative medicine, in October 2021 for $525.3 million, of which $182,988,467 was in cash. Finally, Bioventus acted to acquire CartiHeal, a healthcare company focused on designing knee implants, in July 2022 by depositing $50 million in escrow, and planned to "finance the remaining portion of the potential acquisition of CartiHeal with additional debt." The CartiHeal deal stated that Bioventus would "acquire all of the shares of CartiHeal, excluding those it already owned, for $314.9 million, payable at closing in the second quarter of 2022. Upon the achievement of certain sales milestones, an additional $135.0 million could become payable after closing." These large

transactions strained Bioventus's financial health and, as a result, encouraged Defendants to keep the Company's stock price humming high so that Bioventus could afford the major acquisitions the Company had undertaken.

6.     The revenue Bioventus receives from HA product sales is highly dependent on the number of rebates that Bioventus must pay to third-party payers such as insurance companies and Medicare. Rebates are contracts between the Company and third parties that require certain amounts of sales Bioventus receives from its products to be given back to the third-party. For instance, if the Company sold a Durolane injection to a patient for $20.00, the patient's insurance company may, in turn, ask Bioventus for a $5.00 rebate. Therefore, Bioventus would only make $15.00 in net revenue on this sale instead of $20.00. For Bioventus, rebate amounts are materially significant to the Company's overall revenue. Indeed, Bioventus must, under federal law, maintain effective internal controls and accounting procedures to accurately account for rebates so that the Company files accurate financial statements in accordance with Generally Accepted Accounting Principles ("GAAP"). Specifically, GAAP requires that a company only report revenue affected by rebates if it is "probable that a significant reversal" of reported revenue will not occur in the future. In other words, a company must use their financial controls and procedures to establish a factual basis for reporting revenue which has been affected by rebates.

7.     During the Relevant Period, Defendants assured investors and the investing public—through public filings with the SEC and through positive statements made by the Individual Defendants—that Bioventus had met its financial reporting requirements and had adequate internal controls over financial reporting. Specifically, Defendants represented that Bioventus "report[ed] sales net of contractual allowances, rebates and returns," and calculated

rebate amounts using "historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns."

8.      However, contrary to Defendants' representations, Bioventus failed to establish any procedures for tracking and assessing rebate data. Instead, throughout the Relevant Period, Bioventus arbitrarily and haphazardly calculated rebate data and improperly included it in the Company's revenue without actually conducting any assessments into whether the numbers were accurate or would otherwise need to be restated after rebates were properly subtracted. As a result of Bioventus failing to subtract qualifying rebates from its reported revenue, throughout the Relevant Period, the Company's revenue figures were artificially inflated, falsely representing to investors that Bioventus's business was thriving.

9.      Plaintiff's counsel in the Securities Class Action (defined below) interviewed six former employees of Bioventus, who noted that these rebate problems were well-known internally at the Company. Indeed, one of the former employees noted that, although the Company used accounting software such as Oracle PBCS and SAP, the software had little functionality and, by way of comparison, vastly less functionality than other public companies. Instead, Bioventus relied on employees to manually calculate sophisticated data points, including revenue, salary, and payroll expenses, among others. Regarding rebates in particular, the Company had no procedures in place to monitor revenue, rebates, or rebate discounts for the insurance companies with which Bioventus conducted business. Consequently, for more than a year during the Relevant Period, Bioventus violated GAAP by issuing false and misleading financial statements wherein the Company materially overstated revenue and Adjusted EBITDA by failing to subtract known rebates from the Company's revenue. In particular, during the Relevant Period, Bioventus received rebate claims from UnitedHealthcare ("United") for $8.4 million and $4 million. Since Bioventus

did not accurately calculate its rebate claims, the Company incorrectly included these two rebates claims, or $12.4 million in total, as ***revenue*** in its filings with the SEC, despite Bioventus actually ***owing*** that money to United.

10.     Importantly, by classifying the $12.4 million United rebates as revenue, Bioventus was able to boost its financial performance and surpass investors and analysts' earnings projections, thereby making the Company appear more profitable than it was. Coupled with Defendants' false representations that Bioventus had adequate internal controls over financial reporting, investors, analysts, and the public were left in the dark about the true state of the Company.

11.     Worsening matters, throughout the Relevant Period, Defendants were continuously made aware of the deep issues plaguing the Company's accounting practices, yet failed to mitigate these problems or inform investors of their existence. Indeed, according to former employee testimony provided by witnesses in the Securities Class Action, Defendants Reali and Anglum attended meetings every quarter in Bioventus's board room at Company headquarters wherein they heard frequent complaints from Company employees about incorrect rebate estimates. Additionally, at Monthly Financial Close Meetings, Defendant Anglum, and later Defendant Singleton, heard issues about Bioventus's rebate estimates and the poor overall condition of the Company's financial reporting procedures from Bioventus employees.

12.     However, despite Bioventus's internal control weaknesses and Defendants' knowledge of the same, the Company continued to claim its internal control processes and revenue rebate estimates were effective and accurate. Then, in the spring of 2021, Bioventus received the first multi-million-dollar rebate invoice from United. In response, Bioventus "scrambled" to assess the United rebate, which triggered an internal audit of the Company's rebate process that began in

May or June of 2021. The internal audit reviewed all of Bioventus's rebate procedures for the previous twelve months of rebates and evaluated the Company's internal controls regarding rebates, including controls mandated by the Sarbanes-Oxley Act ("SOX").

13.     According to other former employees interviewed in the Securities Class Action, after almost four months of auditing Bioventus, the internal auditors determined that the Company had failed the internal audit and issued a "Red Report" which outlined about twelve separate "red" action items, indicating severe problems across several of the Company's reporting procedures and internal controls which required immediate remediation. The Red Report further revealed that Bioventus lacked adequate controls regarding rebates, rebate payments, and rebate accruals, did not pass SOX internal control testing, and did not adequately implement the controls that it had previously been required to implement.

14.     The former employees interviewed in the Securities Class Action further revealed that, by the end of August or beginning of September 2021, the Red Report was emailed to Defendants Reali, Anglum, and Stalnecker. The Red Report was also added to the Audit and Risk Committee's agenda, given to the Audit and Risk Committee's members, Defendants Beyer and Ladone, and discussed during an Audit and Risk Committee presentation at a quarterly Board meeting.

15.     Despite Defendants knowing of Bioventus's inadequate internal controls—and the dissemination and discussion of the Red Report—as early as summer 2021, Defendants failed to notify the investing public of the Company's inadequate internal controls or of the multi-million-dollar rebate invoice that Bioventus had received months earlier from United. In fact, Defendants Reali and Anglum did the exact opposite, muddying the waters further by certifying in the Company's Forms 10-Q for the first, second, and third quarters of 2021 that Bioventus had

disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."

16.    To make matters worse, the Company was understaffed, and existing staff members were not appropriately trained on how to handle the financial reporting requirements of a public company. Indeed, one former Company employee interviewed in the Securities Class Action described the Company as "a shitshow" because of how understaffed and overworked Company employees were due to the flurry of acquisitions. Another maintained that Defendant Reali threw his energy wholeheartedly into acquiring other companies and neglecting the needs of Bioventus, such as by failing to implement a system of adequate internal controls. Others noted that the Company was plagued by employees who were holdouts from when Bioventus was a private company and were thus not equipped to handle the new demands Bioventus faced as a publicly traded company. Certain former employees also alleged that, despite Bioventus's claims to the contrary, the issues identified in the Red Report were not "a surprise" to the Company's leadership and that "[t]hey knew it was broken."

17.    Further, although the Red Report set out several actions with strict deadlines for the Company to complete to remediate its shortcomings, including the construction of a procedure for rebate management so that Bioventus could calculate current rebates and estimate future rebates, Bioventus failed to complete these actions due to inadequate employee staffing. By January 2022, Bioventus had still not completed the necessary actions mandated in the Red Report, despite the strict deadlines outlined therein having passed.

18.    Indeed, by January 2022, Bioventus was saddled with debt exceeding $360 million from its acquisitions of Bioness and Misonix, which amplified the issues facing the Company regarding internal control failures and the Company's failure to remediate them. Because of the

financial stress the Company was under, Defendants needed to assure the investing public that the revenue from the Company's HA products would cover the costs of Bioventus's previous and future acquisitions.

19.     On March 10, 2022, Bioventus released guidance that projected significant growth from HA product sales. Specifically, Bioventus projected 2022 revenue growth of 26% to 31% year-over-year, hitting somewhere between $545 million and $565 million. That same day, Defendant Reali emphasized during an earnings call that Bioventus's "HA business…continue[s] to gain market share with Durolane…and Gelsyn." He further indicated that "we see that [growth] continuing" as the "HA market is very strong."

20.     However, contrary to Defendants' representations, Bioventus's revenue was not growing. Additionally, the Company was starting down a difficult path to maintain its current revenue levels due to newly enacted federal regulations regarding Medicare drug pricing that reduced prices for Bioventus's two main HA products, Durolane and Gelsyn,.

21.     Bioventus's HA products contracts normally used two kinds of pricing for reporting: (1) Wholesale Acquisition Cost ("WAC") which does not include rebates and discounts; and (2) Average Sales Price ("ASP") which includes rebates and discounts and is thus "net" pricing. Since WAC pricing did not include rebates and discounts and thus reflected "gross" pricing, WAC pricing forced Medicare and Medicaid to pay higher prices for Bioventus's Durolane and Gelsyn drugs than it otherwise would have, thus allowing the Company to make a hefty profit from these sales. In December 2020, Congress changed certain federal regulations regarding drug pricing because drug makers that did not have a Medicaid drug rebate agreement with the Centers for Medicare & Medicaid Services ("CMS"), like Bioventus, had previously been

allowed to report only WAC pricing to CMS, thereby providing misleading estimates of their revenue figures.

22.     For this reason, Bioventus was required to start reporting ASP pricing for Durolane and Gelsyn to CMS on January 1, 2022. The new federal regulations requiring ASP pricing put the Company at great financial risk since CMS could now reduce prices, and thus the amount Medicare and/or Medicaid paid to Bioventus, for Durolane and Gelsyn. In turn, Bioventus's revenues would dwindle based on these price reductions.

23.     Making matters worse for Bioventus, the Medicare/Medicaid price cuts would not only affect the Company's revenue from Medicare/Medicaid payers but would also lower the prices of the Company's products for non-Medicare/Medicaid payers, since non-Medicare/Medicaid patient pricing, set by private healthcare entities, often modified their pricing when Medicare/Medicaid cut prices.

24.     However, throughout the Relevant Period, Defendants concealed this reality from investors, instead representing on several occasions that the new federal regulations which switched WAC pricing to ASP pricing would not affect the Company and that their impact was "net-neutral" since Bioventus "offset lower pricing" by reducing "all of our rebates on our contracted business." They further assured investors that Bioventus "looked at this very carefully" by monitoring the "volume in our business." After the Medicare price reductions, Defendants asserted that it "turned out exactly the way we thought it would" and unfolded "true to our model" so that "all of our ASP impact has been negated."

25.     This was not the case for several reasons. First, Bioventus could not "look at this very carefully" by monitoring "volume" in the business since the Company had no effective procedures and systems to accurately calculate rebates, and consequently, revenue itself. Second,

the effects of this regulatory change were not "net-neutral" for Bioventus, but instead were critical to Bioventus's bottom line since the difference between WAC and ASP pricing for Durolane and Gelsyn was materially significant, and detrimental, to Bioventus. For example, Gelsyn's ASP fell 8% during the period from July 31, 2022 to October 31, 2022, and fell another 22% during the period from October 31, 2022 to January 31, 2023. Likewise, Durolane's ASP fell 11% and then another 20% during the aforementioned time frame. In other words, the price Medicaid paid for Gelsyn and Durolane under the newly mandated ASP pricing made Bioventus highly susceptible to negative impacts on the Company's revenue.

26.     Interestingly, Durolane's and Gelsyn's significant price variations between WAC and ASP pricing were not reflected in the other 62 products that were added to CMS's Medicare Part B price list. In fact, of the 64 products added to Medicare Part B's price list, which has used drug makers' reported ASP since January 31, 2021, the median change for the first quarter was a mere -0.1%, and the median change for the second quarter was 0.0%. Thus, Durolane's and Gelsyn's prices were much more detrimentally affected from ASP pricing than other drug makers' products, thereby indicating that Bioventus was less prepared than other drug makers for the shift to ASP pricing, and further indicating that Bioventus did not "negate" "all of our ASP impact" and did not "offset lower pricing" as Defendants had previously represented to investors.

27.     The truth about Bioventus began to emerge on November 8, 2022, when the Company filed a Form 8-K with the SEC which revealed a disappointing third quarter of 2022 financial performance. The Company reported revenue of $137.1 million and EBITDA of $22.7 million, which fell significantly lower than analysts' estimates of $141.6 million and $25.3 million. Bioventus also reported $55.419 million in net sales for the Pain Treatments vertical. The Company also revealed that demand for Gelsyn cratered, dipping revenue by 13% quarter over

quarter for the Pain Treatments vertical. Because of these poor results, Bioventus reduced guidance for net sales from the previous range of $547.5 million to $562.5 million to $527 million to $532 million.

28.     That same day, Bioventus hosted an earnings call to discuss various problems it was facing. On the call, Defendant Reali conceded that the "revenue shortfall" was "primarily . . . attributed to transitory headwinds related to GELSYN." He further stated the revenue shortfall was from "higher than normal rebate claims due to unexpected prior period rebate charges from a private payer who found errors in their earlier claims reporting" and "the recent change in pricing to average selling price, or ASP, from wholesale acquisition cost, or WAC."

29.     On this news, the Company's share price dropped $4.06, or 57.5%, from a closing price of $7.06 per share on November 7, 2022, to close at $3.00 per share on November 8, 2022. Analysts remarked that this disclosure was "thesis changing" and that it was "clear the shift to ASP reporting from WAC[] has impacted the commercial stability here; this comes in sharp contrast to prior management commentary that called for ASP declines to be offset by reduced rebate levels."

30.     On November 16, 2022, the truth continued to emerge when the Company announced it would be unable to timely file its Form 10-Q with the SEC for the third quarter of 2022 and revealed that Bioventus may have to take "an impairment charge in the range of $185 million to $205 million." In this disclosure, Bioventus further revealed that the Company was "seeking resolution" of the validity of a "revised invoice" for "rebate claims from a large private payer in relation to our Pain Treatments vertical," and that the "recognition of additional rebates may impact Bioventus's recently announced revenue guidance." Bioventus also cryptically stated that the Company was "evaluating whether [it] will be able to meet all of its financial obligations as they come due within one year . . . ."

31.     On this news, the Company's stock price fell $1.00 per share, or 33%, from a closing price of $2.97 per share on November 16, 2022 to close at $1.97 per share on November 17, 2022.

32.     Soon after this news reached the market, analysts at Morgan Stanley determined that the Company "received an invoice for rebate claims" which Morgan Stanley expected "will be a multiple of the ~$2m headwind stated on the 3Q22 call for '22 guidance." Accordingly, Morgan Stanley removed its rating and price per share target for Bioventus's Class A common stock, citing the "potential risk of going concern," and that the Company was "very much a 'show me' story in need of a restructuring/turnaround to restore investor confidence."

33.     On November 21, 2022, the Company belatedly filed its Form 10-Q for the third quarter of 2022 with the SEC, which revealed that rebate claims for the third quarter of 2022 caused an ***$8.4 million reduction in revenue*** that had previously been reported for the third quarter of 2022, along with a ***$4.3 million reduction in Adjusted EBITDA***. The Company chalked up the $8.4 million revenue reversal to "open rebates and accruals." This reversal solidified a 16% year-over-year revenue decline of $8.953 million in Pain Treatments vertical revenues in the United States. Bioventus revealed that the decline in Pain Treatments revenues was "due to more treatments being sold under contracts with major issuers at lower prices and price competition within the osteoarthritic joint pain treatment market." (Emphasis added.)

34.     In this disclosure, the Company also revealed a $189.2 million "non-cash impairment charge required by U.S. generally accepted accounting principles [GAAP]" "due to the recent decline in our market capitalization." This disclosure thereby admitted that Bioventus's overall business was suffering significantly from ASP pricing and the Company's internal control issues. Bioventus also commented on its internal controls issues, stating that the "Company's

management, including our Chief Executive Officer and Chief Financial Officer, identified a material weakness related to the Company's internal control over financial reporting," meaning that there was "a deficiency, or a combination of deficiencies, in internal control over financial reporting," such that there was "a reasonable possibility that *a material misstatement of the Company's annual or interim financial statements [would] not be prevented or detected and corrected on a timely basis*." (Emphasis added.)

35.     In particular, Bioventus admitted that its "internal control over financial reporting was not performed at a sufficient level of precision to ensure that the third quarter 2022 rebates accrual was complete and accurate." For the first time, Bioventus conceded that when it had received the multi-million-dollar invoice from United, "there were not processes in place to ensure it was reviewed timely in order to update the [third quarter rebates] accrual."

36.     Bioventus also revealed that the $8.4 million drop in revenue "related to the rebates accrual adjustment for 2022 and [sic] cascading effect on future revenue projections materially impacted the Company's evaluation of its ability to meet debt covenants, resulting in liquidity and going concern disclosures in the" 10-Q. The Company explained that recent "*conditions and events raise substantial doubt about the Company's ability to continue as a going concern*." (Emphasis added.)

37.     On this news, the Company's stock price fell $0.07 per share, or 3.7%, from a closing price of $1.88 per share on November 21, 2022 to close at $1.81 per share on November 22, 2022.

38.     The day after this news reached the market, analysts at Craig-Hallum issued a report about Bioventus, stating, "[W]e learn there are in-fact more errors in store and are moving to the sidelines until faith in financials/operating business can be restored and hard decisions around

BVS' future are made." Craig-Hallum put Bioventus's stock on a "Hold" rating and stated that the main cause of the "restatements" was "the rebate snafu that appeared in Q3 where BVS was receiving too high of HA payments from an insurer for at least a year – this amount was incorrect." The report further stated that "[t]he rebate question above does add questions to the financial infrastructure backbone at BVS and if more 'rebate adjustments' are necessary elsewhere."

39.     However, Defendant Reali continued to mislead investors with his statements at the JPMorgan Healthcare Conference on January 11, 2023. During the conference, Defendant Reali asserted that Durolane was not negatively affected by the ASP price change and that Bioventus had previously disclosed all of the rebate issues facing the Company. He also stated that the Company had "seen sustained double-digit volume growth and that has counteracted any impact on reduction of transfer price" and that the Company expected to "continue to gain volume growth from Durolane."

40.     On March 31, 2023, the truth fully emerged when Bioventus issued a press release revealing its fourth quarter of 2022 and full year of 2022 financial results. In the press release, Defendant Reali stated that the Company's results "reflect additional pressure in our Pain Treatments vertical, primarily due to additional rebate claims previously not billed to us from a private payer, which offset the double-digit growth we are seeing in the Surgical Solutions vertical."

41.     The press release reported Bioventus's fourth quarter of 2022 net sales: "Total net sales were $125.8 million compared to $130.4 million for the fourth quarter of 2021, a decrease of $4.6 million, or 3.5%, year-over-year, due to a decline in the Pain Treatments vertical, ***primarily driven by a decline in price resulting from higher than expected rebate claims***." (Emphasis added.)

42.     That same day, the Company held an earnings call to discuss its disappointing financial results with investors. During the call, Defendant Reali stated that the Company's financial performance "fell below our expectations" because of "continued pressure across our HA franchise" and alleged "[u]nanticipated rebate claims from one private payer," "along with lower volume growth and decreased selling price across our HA business." He conceded that Bioventus received "rebate claims of approximately $4 million" from United, "which represent claims previously not billed to us. United Optum recently notified us that they had found these unbilled claims in their system through their internal audit of their rebate process in the fourth quarter, which revealed that they had underbilled us." Defendant Reali further admitted that, due to the rebate claims, the Company's "average selling price, or ASP, for both Durolane and Gelsyn is now lower than previously expected," that the Company had "double-digit price loss" on Durolane, and that "Durolane revenue declined high single digits for the quarter." Defendant Reali also revealed that, because the Company was struggling financially, the CartiHeal acquisition deal that stemmed back from July 2022 would have to be reversed, as Bioventus could no longer afford to make the large payments necessary to complete the transaction. Instead, he stated that Bioventus would have to pay $10 million to CartiHeal's former owners to cancel the acquisition.

43.     Also on March 31, 2023, the Company filed its annual report on Form 10-K with the SEC for the year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K revealed that net sales for the Pain Treatments vertical for the United States dropped from $201.068 million in 2021 to $194.830 million in 2022, constituting a 3.1% drop. The 2022 10-K explained that the drop was "due to more treatments being sold under contracts with major insurers resulting from higher than expected rebate claims and price competition within osteoarthritic joint pain treatment market, partially offset with an increase in sales volume." The 2022 10-K further stated that "due

to the manner in which rebates are calculated and paid under certain of our contracts with private

payers, changes in the ASP for our HA viscosupplements may result in larger than expected rebates

payments for the sale of these products."

44.     On this news, the Company's stock price fell $0.14 per share, or 11.6%, from a

closing price of $1.21 per share on March 30, 2023 to close at $1.07 per share on March 31, 2023.

45.     Just days later, on April 3, 2023, analysts from Craig-Hallum stated in a report that

the "unexpected rebate claims from UnitedHealth in combination with a higher mix in contracted

Pain revenues and transition to ASP from WAC drove a 20%+y/y decline in revenue." Likewise,

Canaccord Genuity analysts wrote in another report on the same day that "BVS saw weakness in

Pain Treatments as it continued to experience headwinds in its HA business. HA-specific issues

include 1) another swath of unexpected rebate charges from a private payor and 2) reduced ASP

given higher rebate claims from a higher volume or private payer contracts."

46.     Then, on April 5, 2023, just days after disclosing the truth, Bioventus announced

that Defendant Reali had been informed by the Board on April 3, 2023 that "he would transition

from his role as" CEO. Instead of facing his firing, Defendant Reali resigned as CEO and as a

director the following day, on April 4, 2023. Since Defendant Reali left Bioventus, Anthony P.

Bihl III, Bioventus's former CEO from 2013 until 2020, came back as Interim CEO. In this role,

Bihl has already sold off several businesses acquired during Defendant Reali's time as CEO in

order to build cash levels and stabilize the Company.

47.     During the Relevant Period, the Individual Defendants breached their fiduciary

duties by personally making and/or causing the Company to make to the investing public a series

of materially false and misleading statements about Bioventus's business, operations, and

prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the

Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Bioventus did not have effective internal controls over financial reporting and violated GAAP; (2) The Red Report issued in September 2021 explicitly stated the Company's internal controls failed and the Company could not and did not accurately forecast or calculate rebates; (3) The Red Report was given directly to Defendants Reali and Stalnecker, and disseminated and discussed with other Individual Defendants; (4) As a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and Adjusted EBITDA and improperly recognized $12.4 million in revenue; (5) The effect of Medicare price changing from WAC to ASP was not "net-neutral" for Bioventus; (6) Bioventus was unable to effectively monitor where its HA products were shipped; and (7) Bioventus did not negotiate reduced rebates to mitigate the effects of lower Medicare prices for HA products and reimbursements.

48.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

49.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

50.     In light of the Individual Defendants' misconduct—which has subjected the Company and various of the Individual Defendants to a federal securities fraud class action lawsuit pending in the United States District Court for the Middle District of North Carolina (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were

improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

51.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of various of the Individual Defendants' and the Company's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

52.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act and the Exchange Act.

53.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

54.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

55.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value

of $75,000, exclusive of interest and costs.

56.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated and/or conducting business and maintaining operations in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

57.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Bioventus is incorporated in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff Grogan

58.     Plaintiff Grogan is a current shareholder of Bioventus. Plaintiff has continuously held Bioventus common stock at all relevant times during the Relevant Period. Plaintiff Grogan is a citizen of New York.

### Nominal Defendant Bioventus

59.     Bioventus is a Delaware corporation with its principal executive offices at 4721 Emperor Boulevard, Suite 100, Durham, NC 27703. Bioventus Class A common stock, which the Company issued during the IPO, trades on the NASDAQ under the ticker symbol "BVS."

### Defendant Reali

60.     Defendant Reali served as the Company's CEO and as a director from April 2020 and September 2020, respectively, until his firing on April 4, 2023. According to the proxy statement that the Company filed with the SEC on April 27, 2023 (the "2023 Proxy Statement"), as of April 12, 2023, Defendant Reali beneficially owned 1,707,724 shares of the Company's

common stock, representing 2.7% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on April 12, 2023 was $1.09, Defendant Reali owned approximately $1,861,419 worth of Bioventus stock.

61.     For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Reali received $4,395,235 in total compensation from the Company. This included $737,397 in salary, $1,454,406 in stock awards, $2,181,133 in option awards, and $22,297 in all other compensation. For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Reali received $12,618,883 in total compensation from the Company. This included $690,452 in salary, $10,844,129 in option awards, $1,057,517 in non-equity incentive plan compensation, and $26,785 in all other compensation.

62.     The proxy statement filed with the SEC on April 29, 2022 (the "2022 Proxy Statement") stated the following about Defendant Reali:

> **Kenneth M. Reali** has served as our Chief Executive Officer since April 2020 and as a member of our Board since September 2020. Mr. Reali previously served as President and Chief Executive Officer of Clinical Innovations, LLC, a medical device company focused on advancing woman's healthcare, from June 2015 until its successful sale on February 12, 2020. In this role, Mr. Reali led the company through two successful acquisitions by a private equity firm in October 2017 and later to a leading diagnostic and therapeutic medical technology company in February 2020. Prior to joining Clinical Innovations, LLC, Mr. Reali also served as the President and CEO of Baxano Surgical, Inc., a medical device company, from January 2010 until February 2015, leading its turn-around out of bankruptcy. Mr. Reali also held positions of increasing responsibility at several medical device companies, including Biomet, Inc. (now known as Zimmer Biomet) and Stryker Corporation. Mr. Reali also served as Senior Vice President and General Manager within the Biologics and Clinical Therapies business of Smith & Nephew plc from May 2005 to January 2010, a division which was later spun out to become BV LLC. Mr. Reali served as a member of the board of managers of BV LLC from April 2020 until the time of our IPO. Mr. Reali also currently serves as a member of the board of directors of the Advanced Medical Technology Association, or AdvaMed, an American medical device trade association, and DYSIS Medical Ltd., a medical device company focused on the noninvasive, in-vivo detection of cancerous and pre-cancerous lesions. Mr. Reali also serves on the ethics and health care compliance committee of AdvaMed. Mr. Reali also served from 2015 to December

2021 as a member of the board of directors of Ossio, Ltd. an orthopedic device company, where he was a member of the compensation committee. Mr. Reali holds a Bachelor of Science in Business Administration from Valparaiso University.

63.     Upon information and belief, Defendant Reali is a citizen of North Carolina.

**Defendant Singleton**

64.     Defendant Singleton has served as the Company's Senior Vice President and CFO since March 21, 2022. According to the 2023 Proxy Statement, as of April 12, 2023, Defendant Singleton beneficially owned 68,381 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2023 was $1.09, Defendant Singleton owned approximately $74,535 worth of Bioventus stock.

65.     For the 2022 Fiscal Year, Defendant Singleton received $2,462,452 in total compensation from the Company. This included $336,932 in salary, $990,105 in stock awards, $1,124,928 in option awards, and $10,487 in all other compensation.

66.     The 2023 Proxy Statement stated the following about Defendant Singleton:

*Mark Singleton* has served as the Company's Senior Vice President and Chief Financial Officer since March 2022. Mr. Singleton previously served as Vice President of Finance, Americas Strategic Business Units at Teleflex Inc. ("Teleflex"), a provider of specialty medical devices, from February 2021 to March 2022 and prior to that, served as Teleflex's Vice President of Finance, Vascular Strategic Business Unit from 2014 to 2020. Prior to Teleflex, Mr. Singleton held multiple leadership roles at Lenovo Group Limited, a multinational technology company, including as Executive Director, Think Business Group Chief Financial Officer (2013-2014), Executive Director, Western Europe Chief Financial Officer (2011-2012), Executive Director, North America Chief Financial Officer (2007-2011) and Director, U.S. Finance Manager (2005-2007). Mr. Singleton received his Bachelor of Science from Purdue University and his Master of Business Administration from Duke University, Fuqua School of Business.

67.     Upon information and belief, Defendant Singleton is a citizen of North Carolina.

**Defendant Anglum**

68.     Defendant Anglum served as the Company's Senior Vice President and CFO from August 2017 until April 2022. According to the 2022 Proxy Statement, as of April 22, 2022, Defendant Anglum beneficially owned 237,843 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2022 was $12.80, Defendant Anglum owned approximately $3,044,390 worth of Bioventus stock.

69.     For the 2021 Fiscal Year, Defendant Anglum received $3,718,800 in total compensation from the Company. This included $425,493 in salary, $100 in bonuses, $1,532,621 in stock awards, $1,472,070 in option awards, $262,025 in non-equity incentive plan compensation, and $26,491 in all other compensation.

70.     Upon information and belief, Defendant Anglum is a citizen of North Carolina.

**Defendant Stalnecker**

71.     Defendant Stalnecker has served as a Bioventus director since September 2020. She also serves as the chair of the Audit and Risk Committee. According to the 2023 Proxy Statement, as of April 12, 2023, Defendant Stalnecker beneficially owned 49,064 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2023 was $1.09, Defendant Stalnecker owned approximately $53,480 worth of Bioventus stock.

72.     For the 2022 Fiscal Year, Defendant Stalnecker received $231,996 in total compensation from the Company. This included $80,000 in fees earned or paid in cash and $151,996 in stock awards. For the 2021 Fiscal Year, Defendant Stalnecker received $552,487 in total compensation from the Company. This included $78,861 in fees earned or paid in cash and $473,626 in stock awards.

73.     The 2023 Proxy Statement stated the following about Defendant Stalnecker:

**Susan M. Stalnecker** has served as a member of the Board since September 2020. Ms. Stalnecker has been a Senior Advisor at Boston Consulting Group, a global management consulting firm, since March 2016. Ms. Stalnecker served as Vice President of E.I. duPont de Nemours and Co. (now known as DuPont de Nemours, Inc., or DuPont), a diversified science and innovations public company and leader in the fields of healthcare, electronics and transportation, from December 1976 until she retired in 2016. During her nearly 40-year career at DuPont, Ms. Stalnecker served in several senior leadership roles including Vice President, Treasurer & M&A; Vice President, Risk Management; Vice President, Government and Consumer Markets; and Vice President, Productivity & Shared Services. Ms. Stalnecker served as a member of the board of managers of BV LLC from November 2018 until our IPO. Ms. Stalnecker also currently serves on the board of directors of Leidos Holding, Inc. and Optimum Funds McQuairie, and serves on the Board of Trustees of the Duke Health System. She also serves on the audit & finance committee of Leidos Inc., the audit committee of Optimum Funds McQuairie and the compliance, audit & finance committees of the Duke Health System. Ms. Stalnecker holds a Master of Business Administration from The Wharton School of the University of Pennsylvania and received her Bachelor of Arts from Duke University.

74.     Upon information and belief, Defendant Stalnecker is a citizen of Delaware.

**Defendant Hawkins**

75.     Defendant Hawkins has served as a Bioventus director and as the chairperson of the Board since September 2020. He also serves as the chair of the Compliance, Ethics, and Culture Committee. According to the 2023 Proxy Statement, as of April 12, 2023, Defendant Hawkins beneficially owned 112,958 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2023 was $1.09, Defendant Hawkins owned approximately $123,124 worth of Bioventus stock.

76.     For the 2022 Fiscal Year, Defendant Hawkins received $316,991 in total compensation from the Company. This included $115,000 in fees earned or paid in cash and $201,991 in stock awards. For the 2021 Fiscal Year, Defendant Hawkins received $905,580 in total compensation from the Company. This included $112,153 in fees earned or paid in cash and $793,427 in stock awards.

77.     The 2023 Proxy Statement stated the following about Defendant Hawkins:

**William A. Hawkins** has served on our Board as Chairperson since September 2020. Mr. Hawkins is a Senior Advisor to EW Healthcare Partners, a leading private equity firm investing in life sciences, which he joined in 2017. From October 2011 to July 2015, Mr. Hawkins served as President and Chief Executive Officer of Immucor, Inc., a leading provider of transfusion and transplantation diagnostic products worldwide. Prior to that, Mr. Hawkins served in positions of increasing responsibility at Medtronic, Inc., a prominent medical technology company, from January 2002 to June 2011, most recently serving as its Chief Executive Officer from November 2007 to June 2011. Mr. Hawkins served as President and Chief Executive Officer of Novoste Corporation, a global leader in the field of vascular brachytherapy, from 1988 to 2002 and has also held several senior leadership positions at American Home Products (now known as Wyeth, LLC), Johnson & Johnson, Guidant Corp. and Eli Lilly and Co. Mr. Hawkins served as a member of the board of managers of BV LLC from January 2016 until our IPO. Mr. Hawkins also currently serves on the board of directors of Biogen Inc. and MiMedx Group Inc., each a public biopharmaceutical company; and Baebies, Inc., Cirtec Medical Corp., Immucor, Inc., Enterra Medical and Virtue Labs, LLC, each a privately-held life science company. Mr. Hawkins serves on the compensation committee of Biogen and chairs the ethics and compliance committee of MiMedx. Mr. Hawkins previously served on the board of directors of Avanos Medical, Inc. from 2015 to April 2021. Mr. Hawkins was elected to the Duke University Board of Trustees in 2011 and currently serves as its Vice Chairman. Mr. Hawkins is also Chair of the Duke University Health System board of directors and a member of the board of directors of the North Carolina Biotechnology Center and the Focused Ultrasound Foundation Society. Mr. Hawkins holds a Master of Business Administration from the University of Virginia Darden School of Business and received a Bachelor of Science in electrical and biomedical engineering from Duke University.

78.     Upon information and belief, Defendant Hawkins is a citizen of North Carolina.

**Defendant Beyer**

79.     Defendant Beyer has served as a Bioventus director since October 2021. He also serves as a member of the Audit and Risk Committee. Defendant Beyer also served as a member of the board of directors of Misonix, Inc. from May 2021 until October 2021, a company that Bioventus acquired in October 2021. According to the 2023 Proxy Statement, as of April 12, 2023, Defendant Beyer beneficially owned 52,519 shares of the Company's common stock. Given that

the price per share of the Company's common stock at the close of trading on April 12, 2023 was $1.09, Defendant Beyer owned approximately $57,246 worth of Bioventus stock.

80. For the 2022 Fiscal Year, Defendant Beyer received $216,996 in total compensation from the Company. This included $65,000 in fees earned or paid in cash and $151,996 in stock awards. For the 2021 Fiscal Year, Defendant Beyer received $55,019 in total compensation from the Company. This included $11,304 in fees earned or paid in cash and $43,715 in stock awards.

81. The 2023 Proxy Statement stated the following about Defendant Beyer:

**Patrick J. Beyer** has served as a member of the Board since October 2021. Mr. Beyer is the President of International and Global Orthopedics for ConMed Corporation, a publicly held medical technology company, a position in which he has served since October 2020. He previously served as President of ConMed International from December 2014 to October 2020. Prior to joining ConMed, Mr. Beyer served as Chief Executive Officer of ICNet, a privately held infectious control software company from 2010 to 2014 when the company was sold. Prior to this, he spent 21 years at Stryker Corporation where he led Stryker Europe from 2005 to 2009; Stryker UK, South Africa and Ireland from 2002 to 2005 and Stryker Medical from 1999 to 2002. Mr. Beyer previously served on the board of directors of Misonix, Inc. from May 2021 to October 2021, where he was a member of its audit committee. Mr. Beyer graduated from Kalamazoo College with a Bachelor of Arts in Economics, Western Michigan University with a Master of Business Administration in Finance and Harvard Business School's Advanced Management Program.

82. Upon information and belief, Defendant Beyer is a citizen of the United Kingdom.

**<u>Defendant Cowdy</u>**

83. Defendant Cowdy has served as a Bioventus director since September 2020. He also serves as a member of the Nominating and Corporate Governance Committee. He also has served as the Chief Business Development and Corporate Affairs Officer for Smith & Nephew plc, a medical equipment manufacturing company, since 2018. Previously and since joining Smith & Nephew in June 2008, he served as Executive Vice President of Business Development and

Corporate Affairs, Head of Corporate Affairs and Strategic Planning, Group Director of Corporate Affairs and Director of Investor Relations.  For this reason, Defendant Cowdy does not receive compensation for his service as a director of Bioventus.

84.     Since Bioventus's IPO in February 2021, Smith & Nephew holds 28.1% of the total voting power of Bioventus through its ownership of 6,229,991 shares of the Company's Class A common stock (constituting 10% of the total outstanding Class A stock) and 15,786,737 shares of the Company's Class B common stock (constituting 100% of the total outstanding Class B stock). According to the 2023 Proxy Statement, as of April 12, 2023, Defendant Cowdy beneficially owned 11,700 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2023 was $1.09, Defendant Cowdy owned approximately $12,753 worth of Bioventus stock.

85.     The 2023 Proxy Statement stated the following about Defendant Cowdy:

**Philip G. Cowdy** has served as a member of the Board since 2020. Mr. Cowdy has served as the Chief Business Development and Corporate Affairs Officer for Smith & Nephew plc, a medical equipment manufacturing company, since 2018. Since joining Smith & Nephew plc in June 2008, he has also served as Executive Vice President of Business Development and Corporate Affairs, Head of Corporate Affairs and Strategic Planning, Group Director of Corporate Affairs and Director of Investor Relations. Prior to joining Smith & Nephew plc, Mr. Cowdy served as a Senior Director at Deutsche Bank for 13 years, providing corporate finance and equity capital markets advice to a variety of UK-based companies. Mr. Cowdy served as a member of the board of managers of BV LLC from January 2012 to October 2017 and again from July 2018 until the time of our IPO, and has served as a member of its audit, compliance and quality committee. Mr. Cowdy received his Bachelor of Science in Natural Sciences from Durham University (UK) and is a qualified chartered accountant.

86.     Upon information and belief, Defendant Cowdy is a citizen of the United Kingdom.

**Defendant Ladone**

87.     Defendant Ladone has served as a Bioventus director since July 2021. She also serves as a member of the Audit and Risk Committee and the Compensation Committee.

According to the 2023 Proxy Statement, as of April 12, 2023, Defendant Ladone beneficially owned 20,275 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2023 was $1.09, Defendant Ladone owned approximately $22,099 worth of Bioventus stock.

88.     For the 2022 Fiscal Year, Defendant Ladone received $224,496 in total compensation from the Company. This included $72,500 in fees earned or paid in cash and $151,996 in stock awards. For the 2021 Fiscal Year, Defendant Ladone received $121,488 in total compensation from the Company. This included $33,632 in fees earned or paid in cash and $87,856 in stock awards.

89.     The 2023 Proxy Statement stated the following about Defendant Ladone:

**Mary Kay Ladone** has served as a member of the Board since July 2021. Ms. Ladone served as Senior Vice President, Corporate Development, Strategy and Investor Relations, of Hill-Rom Holdings, Inc. ("Hill-Rom"), a medical technology provider, from December 2018 to December 2021. Ms. Ladone previously served as Hill-Rom's Vice President, Investor Relations, from July 2016 to December 2018. Ms. Ladone served as Senior Vice President, Investor Relations, of Baxalta Inc. from 2015 to 2016 before joining Hill-Rom. Prior to Baxalta Inc., Ms. Ladone served in a variety of senior finance, business development and investor relations roles for Baxter International, Inc. Since March 2022, Ms. Ladone has also served on the board of directors of Inogen Inc., a publicly traded supplemental oxygen therapies provider, where she is a member of the audit and compensation committees. Ms. Ladone also serves on the board of directors of Kestra Medical Technologies, Inc., a privately held wearable medical device and digital healthcare company, where she has been the chair of the audit committee since September 2022. Ms. Ladone holds a Bachelor of Arts in Finance and Economics from the University of Notre Dame.

90.     Upon information and belief, Defendant Ladone is a citizen of Illinois.

**Defendant Heath**

91.     Defendant Heath has served as a Bioventus director since January 2022. She also serves as a member of the Compliance, Ethics, and Culture Committee and the Corporate Governance Committee. According to the 2023 Proxy Statement, as of April 12, 2023, Defendant

Heath beneficially owned 17,420 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2023 was $1.09, Defendant Heath owned approximately $18,988 worth of Bioventus stock.

92.     For the 2022 Fiscal Year, Defendant Heath received $228,361 in total compensation from the Company. This included $65,000 in fees earned or paid in cash and $163,361 in stock awards.

93.     The 2023 Proxy Statement stated the following about Defendant Heath:

**Michelle McMurry-Heath MD, PhD** has served as a member of the Board since January 2022. Dr. McMurry-Heath served as President and Chief Operating Officer of the Biotechnology Innovation Organization, a membership and advocacy organization focused on improving biotech research and applying biotech innovations to major healthcare challenges, from 2020 to 2022. Dr. McMurry-Heath was previously with Johnson & Johnson ("J&J") from 2014 to 2020, where she served as Global Head of Evidence Generation for Medical Device Companies, and then Vice President of Global External Innovation and Global Leader for Regulatory Sciences. Prior to her time at J&J, Dr. McMurry-Heath was a key science policy leader in government, conducting a comprehensive analysis of the National Science Foundation's policies, programs and personnel. President Obama then named her associate science director of the FDA's Center for Devices and Radiological Health where she served from 2010 to 2014. From 2005 to 2010, Dr. McMurry-Heath was Director of the Health, Biomedical Science and Society Policy Program at the Aspen Institute. Dr. McMurry-Heath began her career as a Senior Policy Advisor for Senator Joseph Lieberman for Health, Social, and Biomedical Innovation Policy from 2001 to 2004. She later served as a Robert Wood Johnson Health and Society Scholar at the University of California, San Francisco and Berkeley from 2004 to 2005 and a Mcarthur Fellow, Global Health for the Council on Foreign Relations from 2004 to 2006. Dr. McMurry-Heath also serves on the board of directors at publicly traded PerkinElmer, where she is a member of the audit committee. Dr. McMurry-Heath received her M.D./Ph.D. in Immunology from Duke University's Medical Scientist Training Program, becoming the first African American to graduate from the prestigious program and her AB in Biochemistry from Harvard University.

94.     Upon information and belief, Defendant Heath is a citizen of Washington, D.C.

**Defendant Neels**

95.     Defendant Neels has served as a Bioventus director since September 2020. He also serves as a member of the Compensation Committee. Since August 2006, Defendant Neels has been with EW Healthcare Partners ("EW Healthcare"), formerly known as Essex Woodlands, a healthcare growth equity and venture capital firm, which Defendant Sutter founded in 1985. Since 2013, Defendant Neels has served as Operating Partner of EW Healthcare. EW Healthcare owns 13,021,324 shares of Company Class A common stock, or 20.8% of the total outstanding Class A stock of the Company, which constitutes 16.6% of the total voting power of Bioventus. According to the 2023 Proxy Statement, as of April 12, 2023, Defendant Neels beneficially owned 28,348 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2023 was $1.09, Defendant Neels owned approximately $30,899 worth of Bioventus stock.

96.     For the 2022 Fiscal Year, Defendant Neels received $214,496 in total compensation from the Company. This included $62,500 in fees earned or paid in cash and $151,996 in stock awards. For the 2021 Fiscal Year, Defendant Neels received $213,503 in total compensation from the Company. This included $55,382 in fees earned or paid in cash and $158,121 in stock awards.

97.     The 2023 Proxy Statement stated the following about Defendant Neels:

**Guido J. Neels** has served as a member of our Board since 2020. Mr. Neels has been with EW Healthcare Partners (formerly Essex Woodlands), a healthcare growth equity and venture capital firm, since August 2006, where he has served as Operating Partner since 2013. Prior to joining EW Healthcare Partners, Mr. Neels served in a variety of management positions at Guidant Corporation, a developer of cardiovascular medical products. From July 2004 until retiring in November 2005, Mr. Neels served as Guidant's Chief Operating Officer, where he was responsible for the global operations of Guidant's four operating units: Cardiac Rhythm Management, Vascular Intervention, Cardiac Surgery and Endovascular Solutions. From December 2002 to July 2004, Mr. Neels served as Guidant's Group Chairman, Office of the President, responsible for worldwide sales operations, corporate communications, corporate marketing, investor relations and government relations. In January 2000, Mr. Neels was named Guidant's President, Europe, Middle East, Africa and Canada. In addition, Mr. Neels served as Guidant's

Vice President, Global Marketing, Vascular Intervention, from 1996 to 2000 and as Guidant's General Manager, Germany and Central Europe, from 1994 to 1996. Mr. Neels served as a member of the board of managers of BV LLC from May 2012 until the time of our IPO. Mr. Neels also currently serves on the board of directors of Axogen, Inc. and is a member of its compensation committee. Mr. Neels previously served on the board of directors of Endologix, Inc. from December 2010 to June 2019 and on the board of directors of Entellus Medical from November 2009 to February 2018, each of which is a public company. Mr. Neels holds a Master of Business Administration from the Stanford University Graduate School of Business and received his Business Engineering degree from the University of Leuven in Belgium.

98.    Upon information and belief, Defendant Neels is a citizen of Indiana.

**Defendant Nohra**

99.    Defendant Nohra has served as a Bioventus director since September 2020. He also serves as the chair of the Compensation Committee. According to the 2023 Proxy Statement, as of April 12, 2023, Defendant Nohra beneficially owned 28,348 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2023 was $1.09, Defendant Nohra owned approximately $30,899 worth of Bioventus stock.

100.    For the 2022 Fiscal Year, Defendant Nohra received $226,996 in total compensation from the Company. This included $75,000 in fees earned or paid in cash and $151,996 in stock awards. For the 2021 Fiscal Year, Defendant Nohra received $224,579 in total compensation from the Company. This included $66,458 in fees earned or paid in cash and $158,121 in stock awards.

101.    The 2023 Proxy Statement stated the following about Defendant Nohra:

**Guy P. Nohra** has served as a member of the Board since 2020. In March 1996, Mr. Nohra co-founded Alta Partners, a life sciences venture capital firm, and he has since been involved in the funding and development of numerous medical technology and life sciences companies. Mr. Nohra served as a member of the board of managers of BV LLC from May 2012 until the time of our IPO. Mr. Nohra currently serves as a member of the board of directors of Spiral Therapeutics, Inc.,

31

a private life sciences company. He also previously served on the board of directors of various public companies, including ATS Medical, Inc., Cutera, Inc., AcelRx Pharmaceuticals, Inc., and ZS Pharma, as well as several private companies, including Bionure, Inc., Sanifit Therapeutics S.A., Carbylan Biosurgery, Inc., Cerenis Therapeutics, Coapt Systems, Paracor Medical, Inc. and PneumRx. Mr. Nohra holds a Master of Business Administration from the University of Chicago and received his Bachelor of Arts in History from Stanford University.

102.    Upon information and belief, Defendant Nohra is a citizen of Nevada.

**Defendant Parker**

103.    Defendant Parker served as a Bioventus director from September 2020 until December 20, 2021.

104.    For the 2021 Fiscal Year, Defendant Parker received $214,006 in total compensation from the Company. This included $55,885 in fees earned or paid in cash and $158,121 in stock awards.

105.    Upon information and belief, Defendant Parker is a citizen of Massachusetts.

**Defendant Sutter**

106.    Defendant Sutter has served as a Bioventus director since September 2020. He also serves as the chair of the Nominating and Corporate Governance Committee. Defendant Sutter founded HW Healthcare, the healthcare venture capital firm that holds 16.6% of the total voting power of Bioventus and where Defendant Neels has served as Operating Partner since 2013. According to the 2023 Proxy Statement, as of April 12, 2023, Defendant Sutter beneficially owned 13,049,672 shares of the Company's Class A common stock, constituting 16.7% of the total voting power of the Company. Given that the price per share of the Company's common stock at the close of trading on April 12, 2023 was $1.09, Defendant Sutter owned approximately $14,224,142 worth of Bioventus stock.

107.   For the 2022 Fiscal Year, Defendant Sutter received $216,996 in total compensation from the Company. This included $65,000 in fees earned or paid in cash and $151,996 in stock awards. For the 2021 Fiscal Year, Defendant Sutter received $215,718 in total compensation from the Company. This included $57,597 in fees earned or paid in cash and $158,121 in stock awards.

108.   The 2023 Proxy Statement stated the following about Defendant Sutter:

**Martin P. Sutter** has served as a member of our Board since 2020. Mr. Sutter is one of the two founding Managing Directors of EW Healthcare Partners (previously known as Essex Woodlands), one of the oldest and largest life sciences and healthcare focused growth equity and venture capital firms, which he formed in 1985. Mr. Sutter has more than 35 years of management experience in operations, marketing, finance and venture capital. Mr. Sutter served as a member of the board of managers of BV LLC from May 2012 until the time of our IPO. Mr. Sutter also currently serves on the board of directors of MiMedx Group, Inc., a publicly traded regenerative medicine life sciences company, and Prolacta Biosciences, Inc., a privately held life sciences company. Mr. Sutter has also previously served on the board of directors of Abiomed, Inc., Tissue Tech, Inc. and Suneva Medical, Inc. Mr. Sutter currently serves on the compensation and nominating and governance committees of MiMedx Group, Inc. and Prolacta Biosciences, Inc. and previously served on the compensation and nominating and governance committee of Abiomed, Inc. Mr. Sutter holds a Master of Business Administration from the University of Houston and received his Bachelor of Science from Louisiana State University.

109.   Upon information and belief, Defendant Sutter is a citizen of North Carolina.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

110.   By reason of their positions as officers, directors, and/or fiduciaries of Bioventus and because of their ability to control the business and corporate affairs of Bioventus, the Individual Defendants owed Bioventus and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Bioventus in a fair, just, honest, and equitable manner. The Individual Defendants were

and are required to act in furtherance of the best interests of Bioventus and its shareholders so as to benefit all shareholders equally.

111.    Each director and officer of the Company owes to Bioventus and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

112.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Bioventus, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

113.    To discharge their duties, the officers and directors of Bioventus were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

114.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Bioventus, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Bioventus's Board at all relevant times.

115. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

116. To discharge their duties, the officers and directors of Bioventus were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Bioventus were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Bioventus's own Code of Compliance and Ethics (the "Code of Ethics");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Bioventus conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Bioventus and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Bioventus's operations would comply with all applicable laws and Bioventus's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

117.    Each of the Individual Defendants further owed to Bioventus and the shareholders the duty of loyalty requiring that each favor Bioventus's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

118.   At all times relevant hereto, the Individual Defendants were the agents of each other and of Bioventus and were at all times acting within the course and scope of such agency.

119.   Because of their advisory, executive, managerial, directorial, and controlling positions with Bioventus, each of the Individual Defendants had access to adverse, non-public information about the Company.

120.   The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Bioventus.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

121.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

122.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

123.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance

of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Bioventus was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

124.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

125.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Bioventus and was at all times acting within the course and scope of such agency.

## BIOVENTUS'S CODE OF ETHICS

126.    Bioventus's Code of Ethics "evidences" the Company's "shared commitment and is a public record" of its "promise to uphold the highest ethical standards when we do business." The Code of Ethics "applies to all directors, officers (including our principal financial officers), and other employees, and those with whom we do business."

127.     The Code of Ethics states that the Company adopted the code to promote compliance with "applicable governmental laws, rules and regulations," "honest, transparent, and ethical conduct," and "full, fair, accurate, timely, and understandable disclosure in reports and documents that Bioventus files with, or submits to, the Securities and Exchange Commission…and in other public communications made by Bioventus."

128.     In a section titled "We Do Business the Right Way," the Code of Ethics states the following regarding insider trading, in relevant part:

> We do not engage in insider trading.
>
> As a company that is publicly traded, Bioventus is subject to regulations regarding insider information. Furthermore, the public and our investors must have confidence that we conduct business with integrity. Bioventus employees should not trade Bioventus common stock based on material, non-public information. Information is material if it could influence an investor's decision to buy, sell, or hold Bioventus shares. Information is considered non-public if Bioventus has not disclosed it to the public.

129.     Later in the same section, the Code of Ethics, in a subsection titled, "We adhere to established quality standards in our research, development, and manufacturing," states the following, in relevant part:

> Bioventus balances its mission to innovate and significantly improve lives with a commitment to our regulatory obligations in the areas of research, development, and manufacturing. Bioventus is committed to conducting activities consistent with all applicable laws and regulations, as well as recognized international ethical guidelines such as Good Laboratory Practices (GLP), Good Manufacturing Practices (GMP) and our internal quality standards.

130.     In a section titled, "We safeguard our assets and maintain our financial integrity," the Code of Ethics states the following, in relevant part:

> Bioventus is committed to honestly and accurately recording and reporting all Company information, both financial and non-financial. You must maintain books and records that accurately reflect the true nature of transactions entered into or conducted by or on behalf of Bioventus. Your records must have enough detail to demonstrate that the transactions meet all applicable legal requirements and our system of internal controls. You must execute transactions in accordance with management's authorization and in conformity with accounting standards and other applicable criteria. For example, expense reimbursement requests must accurately reflect the true nature and amount of the expenses.

131.     In a subsection titled, "We avoid conflicts of interest," the Code of Ethics states the following, in relevant part:

You should avoid any actual or apparent conflicts of interest. A conflict of interest exists when your personal interest interferes with the interests of Bioventus. A conflict of interest can arise whenever you take action or have an interest that prevents you from performing your Company duties and responsibilities honestly, objectively and effectively. Any time a conflict appears, or you are concerned that a conflict might develop, you are required to discuss the matter with your manager or a member of Legal or Compliance. All transactions that would give rise to a conflict of interest involving a director, executive officer, or principal financial officer must be approved by our Board of Directors. Any such approval will not be considered a waiver of this Code.

132.    In a subsection titled, "Compliance with Regulation FD," the Code of Ethics states the following, in relevant part:

In connection with its public communications, Bioventus is required to comply with a rule under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD provides that, when we disclose material non-public information about Bioventus to securities market professionals or stockholders (where it is reasonably foreseeable that the stockholders will trade on the information), we must also disclose the information to the public. "Securities market professionals" generally include analysts, institutional investors and other investment advisors.

133.    Regarding "Reporting Concerns," the Code of Ethics states the following:

You have an affirmative obligation to report any actual or suspected violation of laws, regulations, this Code or other Bioventus policies and procedures. Our ability to investigate and remediate misconduct successfully depends on prompt and confidential reporting. If you know of or suspect misconduct or any violation of this Code, immediately report the conduct using the communication channels below and do not attempt to investigate or determine facts on your own.

134.    In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and aiding and abetting thereof. Also in violation of the Code of Ethics, the Individual Defendants failed to comply with laws and

regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## BIOVENTUS'S AUDIT AND RISK COMMITTEE CHARTER

135.     The Company also maintains an Audit and Risk Committee Charter (the "Charter") that governs the Audit and Risk Committee. According to the Charter, the purpose of the Audit and Risk Committee is to "assist the Board's oversight of the Company's":

- accounting and financial reporting processes and the audits and reviews of the Company's annual and interim financial statements
- risk management practices and procedures

- compliance with legal and regulatory requirements with respect to financial statements, financial reporting, and internal controls

- independent registered public accountants' qualifications, performance, and independence

- internal audit function

- financial reporting risk assessment and mitigation

- disclosure controls and procedures and internal controls over financial reporting, and

- preparation of the report of the Committee to be included in the Company's annual proxy statement in accordance with the rules and regulations of the Securities and Exchange Commission (the "SEC").

136.     Regarding the Company's quarterly Forms 10-Q, the Charter states that: "[t]he Audit Committee shall review and discuss with the Company's management and independent auditor the Company's annual audited financial statements and, prior to the Company's filing of each Form 10-Q with the SEC, the quarterly financial statements, including disclosures under the caption 'management's discussion and analysis of financial condition and results of operation' and the matters required to be discussed by applicable PCAOB standards and SEC rules."

137.    Regarding the Company's proxy statements, the Charter states that "[t]he Audit Committee shall prepare an annual committee report for inclusion where necessary in the proxy statement of the Company relating to its annual meeting of stockholders."

138.    Moreover, with respect to the Company's earnings press releases, the Charter provides that "[t]he Audit Committee will review the information to be disclosed in, and presentation of, the Company's earnings press releases (paying particular attention to any use of "pro forma" or "adjusted" non-GAAP information), discuss the earnings press releases and review any financial information and earnings guidance provided to analysts and rating agencies."

139.    On the topic of "oversight" over "internal controls and disclosure controls," the Charter states that the Audit and Risk Committee "shall coordinate the Board's oversight of the Company's internal control over financial reporting and disclosure controls and procedures" and that such oversight shall include the following:

- review and provide feedback as deemed appropriate on (in) the assessment performed by management on internal control over financial reporting for inclusion in the Company's Annual Report on Form 10-K with respect to quality, adequacy, and effectiveness of the Company's internal control structure and procedures for financial reporting; and (ii) the report and attestation of the independent registered public accountants regarding the Company's internal control over financial reporting;

- discuss with the independent registered public accountants, the internal auditor and management, on a quarterly basis, the Company's internal control over financial reporting and any fraud involving management or others with a significant role in the internal controls; review any major issues as to the adequacy of the Company's internal control over financial reporting and any special audit steps adopted in light of any significant deficiencies or material weaknesses; receive recommendations for the improvement of such control; and review whether any such previously approved recommendations have been implemented and any other significant changes in internal control over financial reporting have been made since the last evaluation;

- receive and review any disclosure from the Company's Chief Executive Officer or Chief Financial Officer made in connection with the certification

of the Company's quarterly and annual reports filed with the SEC of (a) significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize, and report financial data, and (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control;

- review the disclosure controls and procedures of the Company designed to ensure timely collection and evaluation of information required to be disclosed in the Company's filings with the SEC or posted on the Company's website; and

- review the independent registered public accountants' procedures and management of the audit related to internal control over financial reporting.

140. With respect to oversight over the Company's internal audit function, the Charter provides the following, in relevant part:

- review and approval of internal audit plans, including any recommended changes in the planned scope of such plans, and the internal audit department responsibilities, budget, staffing and overall adequacy of resources;

- review of significant reports to management prepared by the internal audit department, or summaries of such reports, and management's responses thereto;

- periodic review with the director of the Internal Audit department, any significant difficulties, disagreements with management, or scope restrictions encountered in the course of the Internal Audit Department's work;

- receive periodic summaries of findings from completed internal audits and, as appropriate, the status of major audits in process. Receive progress reports on the completion of the current year's internal audit plan, including explanations for any significant deviations from the plan;

receive timely notification of any issues or concerns identified during the course of internal audits; and

- review and discuss with the independent registered public accountants, or other as appropriate, the responsibilities, budget, performance, and staffing of the Company's internal audit function.

141. Finally, with respect to risk oversight and risk management, the Charter provides that the Audit and Risk Committee "shall provide general oversight over the Company's enterprise risk assessment and management processes and discuss the Company's policies with respect to risk assessment and management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled, and oversee management of the Company's financial and cybersecurity risks." To this end, the Charter outlines the following duties the Audit and Risk Committee "shall" complete:

- review and discussion with management (i) the key guidelines and policies governing the Company's significant processes for risk assessment and risk management, (ii) the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, and (iii) other significant business risks of the Company that are not reported to another committee of the Board; and

- regularly report to the Board the substance of such reviews and discussions and, as necessary, recommend to the Board such actions as the Audit Committee deems appropriate.

142. In violation of the Charter, Defendants Stalnecker, Ladone, and Beyer failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Relevant Background

#### Bioventus's Business

143. Bioventus, founded in 2012, is a medical device company that focuses on "cost efficient and minimally invasive treatments that engage the body's natural healing process."

144.    On February 11, 2021, Bioventus held its IPO, with the Company's stock trading on NASDAQ. In the IPO, the Company issued 9.2 million shares of Class A common stock at the IPO price of $13.00 per share, including 1.2 million shares that were issued due to underwriters exercising their option to purchase additional shares. In total, Bioventus took in proceeds of $119.6 million from the IPO.

145.    The Company's products are split into three "verticals": Pain Treatments, which covers non-surgical joint pain injection therapies as well as peripheral nerve stimulation products; Surgical Solutions, which covers bone graft substitutes to fuse and grow bones; and Restorative Therapies, which covers a bone healing system and skin allografts.

146.    Of these three verticals, Pain Treatments offers the largest source of revenue for Bioventus. Indeed, sales of HA injections to treat knee osteoarthritis accounted for 53% of Bioventus's revenue for the fiscal year ended December 31, 2020, 54% of Bioventus's revenue for the fiscal year ended December 31, 2019, and 49% of Bioventus's revenue for the fiscal year ended December 31, 2018.

147.    The Pain Verticals segment contains three HA injection products: (1) Durolane, which is a single injection product that was introduced in 2018; (2) Gelsyn-3 ("Gelsyn"), which is a three-injection therapy that was introduced in 2016; and (3) Supartz FX ("Supartz"), which is a five-injection therapy that was introduced in 2001.

148.    Because of how integral Bioventus's HA injection products were to the Company's overall financial performance, investors paid close attention to the Company's revenues from these products and consequently depended on Bioventus to accurately report the revenue the Company received from its HA injection products.

***Bioventus's Revenue Problems***

45

149.     One of the vital components factored into calculating Bioventus's revenue is the effect that rebates have on overall revenue. Rebates are contracts between the Company and third parties, like insurance companies, that require certain amounts of sales Bioventus receives from its products to be given back to the third-party. For instance, if the Company sold a Durolane injection to a patient for $20.00, the patient's insurance company would, in turn, ask Bioventus for a $5.00 rebate. Therefore, Bioventus would only make $15.00 in net revenue on this sale instead of $20.00. For Bioventus, rebate amounts are materially significant to the Company's overall revenue.

150.     GAAP mandates that Bioventus can only recognize net revenue from its products by including the expected rebates. In other words, in the hypothetical above, Bioventus cannot report $20.00 in revenue for the Durolane injection sale since the Company must factor in the effect the rebate has on revenue. For this reason, it would be incorrect and misleading for Bioventus to state $20.00 as net revenue when the revenue is only $15.00.

151.     GAAP also mandates, pursuant to Accounting Standards Codification ("ASC") 606, that Bioventus only report revenue for which it is "probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period." In this context, a "reversal" occurs when the Company would have to reduce reported revenue that was already reported in a public financial statement. During the Relevant Period, Bioventus repeatedly flouted GAAP requirements by improperly reporting revenue and Adjusted EBITDA that should have been reduced due to impending rebates.

152.     In order to properly recognize revenue under ASC 606, Bioventus is required to (1) identify the contract in question; (2) identify each party's performance requirements under the contract; (3) determine the transaction price; (4) set the transaction price to the performance

requirements under the contract; and (5) recognize revenue when Bioventus or the other party successfully performs under the contract.

153.    Bioventus's rebates pertain to part 3; namely, the proper transaction price. GAAP calls rebates "variable consideration." Under ASC 606, Bioventus is required to only recognize the net amount of revenue, that is, only the revenue Bioventus keeps after subtracting rebates. To this end, ASC 606 requires Bioventus to "estimate the amount of variable consideration" (rebates). ASC 606 provides two ways to make this calculation; Bioventus allegedly utilized the "expected value" way, which "is the sum of probability-weighted amounts in a range of possible consideration amounts." ASC 606 also mandates that companies "consider all the information (historical, current, and forecast) that is reasonably available to the [Company] and [to] identify a reasonable number of possible consideration amounts."

154.    Importantly, GAAP permits companies to use rebates "in revenue only when there is a high degree of confidence that revenue will not be reversed in a subsequent reporting period."

155.    To make these calculations, Bioventus was required to use its customer contracts to estimate rebate amounts. Bioventus's customer contracts included the total amount of rebates per year allowed under the contracts, which made the rebate claims sent to Bioventus entirely predictable. For instance, if an insurance company requested $500.00 in claims per quarter, but only requested $250.000 for the third quarter of a year, Bioventus would know that the fourth quarter request could likely be $750.00.

156.    In its public filings, Bioventus repeatedly asserted that the Company calculated variable consideration using "historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns." However, this was far from the truth.

***Because of Its Deficient Internal Controls Over Financial Reporting, Bioventus Failed
to Accurately Report Revenue***

157.    In reality, Bioventus did not have any procedures or processes in place to monitor

revenue or rebates from each insurance company Bioventus did business with. As mentioned

above, plaintiff's counsel in the Securities Class Action interviewed six former employees of

Bioventus, whose statements are contained in the Securities Class Action's "Second Amended

Complaint" (the "Class Action Complaint"). The statements attributed to the various former

employees ("FE") below come from their statements in the Class Action Complaint. The FEs

corroborate the many problems facing the Company's internal controls and rebate estimates,

among other things.

158.    One such former employee, identified as "FE-2" in the Class Action Complaint,

worked at Bioventus as a Financial Planning and Analysis Manager from October 2021 to June

2022. Prior to this, FE-2 worked for Misonix from January 2021 until Bioventus acquired Misonix

in October 2021. FE-2 stated that the Company did not utilize basic accounting technology, which

made Bioventus's employees' tasks much more difficult and lengthier. Indeed, some tasks that

take just minutes at other companies, such as salary and payroll expenses, took Bioventus

employees weeks to complete since data was manually monitored. FE-2 called this practice

"insane." FE-2 also signaled to Defendant Singleton that Bioventus did not have the financial

systems to properly handle two major acquisitions, calling the Company's financial systems "a

mess." Another former employee of the Company, FE-6, who was a Payment Specialist for

Bioventus from August 2021 to August 2022, noted that "[w]e didn't even know which bills had

been paid or not paid," the Company had "no supporting documents" for bills, and employees

"were blindly paying stuff."

159.    Regarding tracing rebates, Bioventus had its financial team using Excel spreadsheets with thousands of lines, according to FE-5, who worked as an Accounts Payable Specialist. FE-5 described it as a "real mess." Because of these methods, FE-5 stated the Company had "big problems with the whole rebate calculation" and "[t]hey were always off."

160.    FE-5 also stated that Bioventus's senior leadership, including Defendants Reali, Anglum, and Singleton, were repeatedly notified of the significant issues plaguing Bioventus's rebate estimates. For instance, FE-5 revealed that Defendant Reali, Defendant Anglum, and Vice President of Finance Ben Fishburn attended quarterly meetings in Bioventus's "Board Room" at Company headquarters, during which the topics of overstating rebate revenue and inaccurate forecasting were frequently discussed. FE-1 also stated that Defendant Reali was "incompetent" and that his revenue forecast for 2022 was "crazy."

161.    Similarly, FE-2 stated that Bioventus held monthly Financial Close Meetings which Defendant Anglum, and later Defendant Singleton attended, which frequently discussed Bioventus's errant rebate forecasts and shoddy Company technology and procedures for calculating rebates and revenue.

162.    FE-5 stated that Defendants Reali and Anglum also personally approved staggering rebate payments quarterly. According to FE-5, Defendant Reali signed two or three rebates of $1 million or more every quarter, and at least once signed a $3.5 million rebate. However, despite their knowledge of extensive internal control problems throughout the Company, Bioventus's most trusted leadership did nothing to remedy the problems.

### *United Rebate Request in Summer 2021 Triggers Internal Audit, But Defendants Do Nothing*

163.    FE-4, who worked as Senior Manager of SOX & Internal Audit at Bioventus from August 2020 to January 2022, stated that during May or June 2021, Bioventus received a multi-

million-dollar rebate claim from United. After receiving the rebate claim, Bioventus's Internal Audit Manager, FE-3, launched an audit of Bioventus's rebate process. The audit examined the Company's last twelve months of rebates and tested all controls, including SOX controls. The audit was conducted by FE-3 and Director of Internal Audit and Risk Management, Jessica Dill Gidney, according to FE-4.

164.    The wide-ranging audit resulted in the Red Report, which outlined approximately twelve "red" action items Bioventus needed to address, per FE-3. According to FE-4, red is the most serious and concerning audit outcome, with yellow meaning some issues are present, and green meaning all controls are effective. FE-3 stated that the Red Report further determined that Bioventus did not have effective SOX controls or controls regarding rebates, rebate payments, or rebate accruals. FE-3 explained that Bioventus's rebate accrual process was intended to calculate the amount of rebates the Company owed to insurance companies at the end of every month and quarter. Bioventus would set a rebate "accrual" for each insurance company per quarter that would estimate the amount of rebates Bioventus owed to each insurance company. This figure was given as a percentage. For example, 10% accrual signaled that Bioventus thought that, for every $100.00 it made in sales, Bioventus owed an insurance company 10%, or $10.00 in rebates.

165.    Compounding this issue, FE-3 stated Bioventus changed rebate accrual percentages quarterly without justifying the alterations. During the internal audit that produced the Red Report, FE-3 asked the rebate department "Why are you using five percent versus 10 percent?" The response received was "They didn't know."

166.    Rebate estimation was vital for the Company since high accruals caused Bioventus to report less revenue for a quarter, while lower accruals allowed Bioventus to post higher revenues. However, FE-3 stated that Bioventus had no internal controls over financial reporting to

accurately calculate rebate accruals. The Red Report stated that Bioventus never even created, let alone implemented, any established process for calculating rebate estimates. In other words, according to FE-3, Bioventus did not have any internal documents that could back up the rebate accrual estimates the Company produced.

167.    As a result, according to FE-4, Bioventus would "blindly" pay the invoices received from insurance companies without being able to back up or confirm the amounts were correct.

168.    Bioventus's senior leadership was informed of the Company's ineffective controls over financial reporting, including its haphazard method of making rebate accrual calculations, by FE-3 before the Red Report was issued to them. Indeed, FE-3 presided over an exit meeting with Defendant Anglum and other senior leadership wherein FE-3 discussed these issues. FE-3 stated that Defendant Anglum was not surprised by the outcome of the internal audit, saying that, in regard to the rebate accrual employees, "I think [Defendant Anglum] knew they weren't doing their job." FE-3 further stated that no issue highlighted in the internal audit "was a surprise" to senior leadership since "[t]hey knew [the Company's method of making rebate accrual calculations] was broken."

169.    At the end of August 2021 or the beginning of September 2021, FE-3 emailed the Red Report to Defendants Reali, Anglum, Stalnecker, and FE-4. FE-3 and FE-4 stated that the Red Report was subsequently put onto the Audit and Risk Committee agenda, given to the Audit and Risk Committee (which consisted of Defendants Beyer and Ladone), and discussed by the Audit and Risk Committee during a quarterly Board meeting.

170.    Nevertheless, despite their knowledge of the Red Report and its findings, and despite the Red Report giving deadlines for changes the Company was required to implement, per FE-4, the Defendants did not implement the changes. In the fall of 2021, the department leaders

of finance, accounting, internal audit, and other departments told Defendant Anglum, in writing, that their respective departments did not have enough employees to make the required changes, including the establishment of a tested and clear procedure for calculating revenue and rebate accruals. FE-4 stated Bioventus "was a shitshow." Specifically, FE-4 maintained that Defendant Reali focused on acquiring companies while other Company leadership did not bring on the necessary staffing levels required to implement the necessary changes. Moreover, FE-4 stated that Bioventus had many employees who began at the Company before it became public and thus did not have the necessary skills to fulfill the new financial reporting obligations of Bioventus as a public company.

### *Bioventus Fails to Prepare for Medicare ASP Price Shift But Misinforms Investors that the Company is Ready and Would Not Be Negatively Affected*

171.    By January 2022, Bioventus still had not implemented the remedial changes required by the Red Report. Consequently, FE-3 and FE-4 resigned from Bioventus on the same day that month because Bioventus did not prioritize the internal control changes. Also by this time, Bioventus was saddled with debt exceeding $360 million from its acquisitions of Bioness and Misonix. Because of the financial stress the Company was under from these large acquisitions, the Individual Defendants were strongly motivated to assure the investing public that Bioventus's HA products would cover the costs of Bioventus's previous and future acquisitions and would not be negatively affected by newly implemented federal regulations that would change how Bioventus could price its highest revenue generating products for Medicare.

172.    To this end, on March 10, 2022, Bioventus released towering guidance that projected significant growth from HA product sales. Specifically, Bioventus projected 2022 revenue growth of 26% to 31% year-over-year, hitting somewhere between $545 million and $565 million. That same day, Defendant Reali emphasized during an earnings call the Company's "HA

business where we continue to gain market share with Durolane, our single injection, and Gelsyn, [] our 3 injection, and we see that continuing. The HA market is very strong."

173.    However, contrary to Defendants' representations, Bioventus's revenue was not growing. Additionally, the Company was starting down a difficult path to maintain its current revenue levels due to newly enacted federal regulations regarding Medicare drug pricing that reduced prices for Bioventus's two main HA products, Durolane and Gelsyn.

174.    Bioventus's HA products contracts normally used two kinds of pricing for reporting: (1) WAC, which does not include rebates and discounts; and (2) ASP, which includes rebates and discounts and is thus "net" pricing. Congress changed the federal regulation because drug makers that did not have a Medicaid drug rebate agreement with CMS, like Bioventus, were allowed to only report WAC pricing to CMS. Since WAC pricing did not include rebates and discounts and thus reflected "gross" pricing, WAC pricing forced Medicare and Medicaid to pay higher prices for Bioventus's Durolane and Gelsyn drugs than it otherwise would have. Therefore, Bioventus significantly benefitted from the use of WAC pricing since the Company already had inflated revenues from the improper tracking of rebate claims.

175.    For this reason, the new federal regulations requiring ASP pricing put the Company at great risk when WAC-only pricing ended on January 1, 2022. This meant that Bioventus was required to start reporting ASP pricing for Durolane and Gelsyn to CMS on January 1, 2022. CMS processed this data over the following months, and by July 2022, could reduce prices, and thus the payments Medicaid made, to Bioventus for Durolane and Gelsyn. In turn, Bioventus's revenues would dwindle because of the price reductions.

176.    Making matters worse for Bioventus, the Medicare/Medicaid price cuts would not only affect the Company's revenue from Medicare/Medicaid payers but would also lower prices

for non-Medicare/Medicaid payers, since non-Medicare/Medicaid patient pricing, set by private healthcare entities, often modified their pricing when Medicare/Medicaid cut prices.

177.    However, throughout the Relevant Period, Defendants concealed this reality from investors, instead representing on several occasions that the new federal regulations which switched WAC pricing to ASP pricing would not affect the Company and that their impact was "net-neutral" since Bioventus "offset lower pricing" by reducing "all of our rebates on our contracted business." They further assured investors that Bioventus "looked at this very carefully" by monitoring the "volume in our business." After the Medicare price reductions, Defendants asserted that it "turned out exactly the way we thought it would" and unfolded "true to our model" so that "all of our ASP impact has been negated."

178.    This was not the case for several reasons. First, Bioventus could not "look at this very carefully" by monitoring "volume" in the business since the Company had no effective procedures and systems to accurately calculate rebates, and consequently, revenue itself. Second, the effects of this change were not "net-neutral" for Bioventus, but instead were critical to Bioventus's bottom line. The difference between WAC and ASP pricing for Durolane and Gelsyn was materially significant, and detrimental, to Bioventus. For example, Gelsyn's ASP fell 8% during the period from July 31, 2022 to October 31, 2022, and fell another 22% during the period from October 31, 2022 to January 31, 2023. Likewise, Durolane's ASP fell 11% and then another 20% during the aforementioned time frame. In other words, the price Medicaid paid for Gelsyn and Durolane under the newly mandated ASP pricing made Bioventus highly susceptible to negative effects in revenue.

179.    Interestingly, Durolane's and Gelsyn's significant price variations between WAC and ASP pricing were not reflected in the other 62 products that were added to CMS's Medicare

Part B price list. In fact, of the 64 products added to Medicare Part B's price list, which has used drug makers' reported ASP since January 31, 2021, the median change for the first quarter was a mere -0.1%, and the median change for the second quarter was 0.0%. Thus, Durolane's and Gelsyn's prices were much more detrimentally affected from ASP pricing than other drug makers' products, which shows that Bioventus was less prepared than other drug makers regarding the shift to ASP pricing, and certainly did not "negate" "all of our ASP impact" and did not "offset lower pricing" as Defendants represented to investors.

180.    In sum, Bioventus heavily relied on its HA products business, which primarily consisted of the sale of Gelsyn and Durolane. Analysts from J.P. Morgan, in a March 8, 2021 report, pointed this fact out when they wrote that Bioventus's HA products business consisted of 40% for Medicare and 60% for commercial payers. For the first quarter of 2021, Bioventus reported $41.53 million in revenue from Pain Treatments (the business segment that encompasses HA products). Of the $41.53 million in revenue, $16.6 million came from Medicare. Since Durolane and Gelsyn were Bioventus's two main products, they likely constituted at least $11 million of the $16.6 million paid by Medicare for the first quarter of 2021. Since the shift to ASP pricing led to an approximate 20% decrease in pricing of Durolane and Gelysn, the Company would experience a multi-million-dollar negative effect on revenue due to the price drops. On top of this direct drop in revenue from Medicare, which constituted 40% of the HA product business, Bioventus would negatively feel an impact on the larger, commercial payer side of the business as well, since private companies look to Medicare prices to set their own contracts with drug makers. In sum, Bioventus would face challenges to its biggest HA products on both the Medicare and commercial fronts, contrary to Defendants representations.

181.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Bioventus's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Bioventus did not have effective internal controls over financial reporting and violated GAAP; (2) The Red Report issued in September 2021 explicitly stated the Company's internal controls failed and the Company could not and did not accurately forecast or calculate rebates; (3) The Red Report was given directly to Defendants Reali and Stalnecker, and disseminated and discussed with other Individual Defendants; (4) As a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and Adjusted EBITDA and improperly recognized $12.4 million in revenue; (5) The effect of Medicare price changing from WAC to ASP was not "net-neutral" for Bioventus; (6) Bioventus was unable to effectively monitor where its HA products were shipped; and (7) Bioventus did not negotiate reduced rebates to mitigate the effects of lower Medicare prices for HA products and reimbursements. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

**False and Misleading Statements**

***February 12, 2021 Registration Statement and Prospectus***

182.     On January 20, 2021, Bioventus filed its registration statement with the SEC on Form S-1, which was subsequently amended several times. On February 10, 2021, the registration statement, along with its amendments, was declared effective by the SEC (the "Registration Statement"). On February 12, 2021, Bioventus filed a prospectus on Form 424B4 with the SEC, which incorporated part of the Registration Statement (the "Prospectus"). Defendants Reali,

Anglum, Hawkins, Cowdy, Neels, Nohra, Stalnecker, Parker, and Sutter signed the Registration Statement.

183.    The Registration Statement misleadingly asserted that the Company's revenue recognition policy provided that Bioventus would only report revenues that were "net of estimates of variable consideration resulting from discounts, rebates, returns, chargebacks, [and] contractual allowances."

184.    The Registration Statement also asserted that "these estimates take into consideration a range of possible outcomes, which are probability-weighted for relevant factors such as our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns."

185.    Regarding rebates, the Registration Statement asserted that "We reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases."

186.    Additionally, the Registration Statement represented that the Company's revenue reporting procedures were in compliance with ASC 606, asserting that "[t]he amount of variable consideration is included in the transaction price," and consequently, the Company reported revenue "only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period." The Registration Statement also assured investors it would "regularly review all reserves and update them at the end of each reporting period as needed."

187.    The Prospectus stated that "We report sales net of contractual allowances, rebates, and returns." The Prospectus also stated the followed regarding revenue recognition:

*Revenue recognition*

Sale of products . . . .

We recognize revenue at a point in time upon transfer of control of the promised product to customers in an amount that reflects the consideration we expect to receive in exchange for those products. We exclude from revenues taxes collected from customers and remitted to governmental authorities.

Revenues are recorded at the transaction price, which is determined as the contracted price net of estimates of variable consideration resulting from discounts, rebates, returns, chargebacks, contractual allowances, estimated third-party payer settlements and certain distribution and administration fees offered in our customer contracts and other indirect customer contracts relating to the sale of our products. We establish reserves for the estimated variable consideration based on the amounts earned or eligible for claim on the related sales. Where appropriate, these estimates take into consideration a range of possible outcomes, which are probability-weighted for relevant factors such as our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns. The amount of variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period. We regularly review all reserves and update them at the end of each reporting period as needed. Adjustments arising from the change in estimates of variable consideration were not significant for the years ended December 31, 2019 and 2018.

188.    The Prospectus also discussed forecasting and account for discounts and rebates, stating the following in relevant part:

**Discounts and rebates**

. . . We reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases.

189.    The statements in ¶¶ 182-188 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Bioventus did not have effective internal controls over financial reporting; (2) the Company did not have "estimates" that take "into consideration a range of possible outcomes, which are probability-weighted for relevant factors such as our historical

experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns"; (3) the Company was not complying with GAAP requirements and did not include "[t]he amount of variable consideration . . . in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period"; (4) as a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and Adjusted EBITDA and improperly recognized $12.4 million in revenue; and (5) the Company did not "regularly review all reserves and update them at the end of each reporting period as needed." As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

### March 26, 2021 Annual Report

190.    On March 26, 2021, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K was signed by Defendants Reali, Anglum, Hawkins, Cowdy, Neels, Nohra, Stalnecker, and Sutter, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Reali and Anglum attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

191.    The 2020 10-K reported that "We report sales of contractual allowances, rebates and returns." The 2020 10-K also stated the following in regard to revenue recognition:

### Revenue recognition

Sale of products . . . .

We recognize revenue at a point in time upon transfer of control of the promised product to customers in an amount that reflects the consideration we expect to receive in exchange for those products. We exclude from revenues taxes collected from customers and remitted to governmental authorities.

Revenues are recorded at the transaction price, which is determined as the contracted price net of estimates of variable consideration resulting from discounts, rebates, returns, chargebacks, contractual allowances, estimated third-party payer settlements and certain distribution and administration fees offered in our customer contracts and other indirect customer contracts relating to the sale of our products. We establish reserves for the estimated variable consideration based on the amounts earned or eligible for claim on the related sales. Where appropriate, these estimates take into consideration a range of possible outcomes, which are probability-weighted for relevant factors such as our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns. The amount of variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period. We regularly review all reserves and update them at the end of each reporting period as needed. There were no adjustments arising from the change in estimates of variable consideration for the years ended December 31, 2020 and 2019.

192.    The 2020 10-K reported the following regarding discounts and rebates:

**Discounts and rebates**

. . . We reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases.

193.    The notes to the financial statements in the 2020 10-K reported the following regarding discounts and gross-to-net deductions:

*Discounts and gross-to-net deductions*

. . . The Company reduces revenue and records the reserve as a reduction to accounts receivable for the estimated discount and rebate at the expected amount the customer will earn, based on historical buying trends and forecasted purchases.

194.    The 2020 10-K stated the following regarding the sufficiency of Bioventus's internal controls and procedures:

***Evaluation of Disclosure Controls and Procedures***

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Annual Report. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2020. . . .

During 2020 we remediated a material weakness associated with the proper processing of Exogen reimbursement claims in accordance with regulations and contractual terms.

### May 13, 2021 Form 10-Q

195.    On May 13, 2021, the Company filed its quarterly report with the SEC for the period ended April 3, 2021 (the "1Q21 10-Q"). The 1Q21 10-Q was signed by Defendant Anglum, and contained SOX certifications, signed by Defendants Reali and Anglum, attesting to the accuracy of the financial statements contained in the 1Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

196.    The 1Q21 10-Q stated the following regarding revenue recognition:

**Revenue recognition**

Our policies for recognizing sales have not changed from those described in the Company's 2020 Annual Report on Form 10-K.

197.    The 1Q21 10-Q stated the following regarding the sufficiency of Bioventus's internal controls and procedures:

### Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of April 3, 2021.

*August 11, 2021 Form 10-Q*

198.    On August 11, 2021, the Company filed its quarterly report with the SEC for the period ended July 3, 2021 (the "2Q21 10-Q"). The 2Q21 10-Q was signed by Defendant Anglum, and contained SOX certifications, signed by Defendants Reali and Anglum, attesting to the accuracy of the financial statements contained in the 2Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

199.    The 2Q21 10-Q stated the following regarding revenue recognition:

**Revenue recognition**

Our policies for recognizing sales have not changed from those described in the Company's 2020 Annual Report on Form 10-K.

200.    The 2Q21 10-Q stated the following regarding the sufficiency of Bioventus's internal controls and procedures:

*Evaluation of Disclosure Controls and Procedures*

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of July 3, 2021.

*November 10, 2021 Form 10-Q*

201.    On November 10, 2021, the Company filed its quarterly report with the SEC for the period ended October 2, 2021 (the "3Q21 10-Q"). The 3Q21 10-Q was signed by Defendant Anglum, and contained SOX certifications, signed by Defendants Reali and Anglum, attesting to the accuracy of the financial statements contained in the 3Q21 10-Q, the disclosure of any material

changes to the Company's internal controls, and the disclosure of any fraud committed by the

Company, its officers, or its directors.

202.    The 3Q21 10-Q stated the following regarding revenue recognition:

**Revenue recognition**

Our policies for recognizing sales have not changed from those described in the
Company's 2020 Annual Report on Form 10-K.

203.    The 3Q21 10-Q stated the following regarding the sufficiency of Bioventus's

internal controls and procedures:

***Evaluation of Disclosure Controls and Procedures***

Our management, with the participation of our Chief Executive Officer and Chief
Financial Officer, conducted an evaluation of the effectiveness of our disclosure
controls and procedures as of the end of the period covered by this Quarterly Report
on Form 10-Q. Based on this evaluation, our Chief Executive Officer and Chief
Financial Officer concluded that our disclosure controls and procedures were
effective at the reasonable assurance level as of October 2, 2021.

204.    The statements in ¶¶ 190-203 above were materially false and misleading and failed

to disclose the facts necessary to make the statements made not materially false and misleading.

Specifically, they failed to disclose that: (1) Bioventus did not have effective internal controls over

financial reporting; (2) the Company did not have "estimates" that take "into consideration a range

of possible outcomes, which are probability-weighted for relevant factors such as our historical

experience, current contractual requirements, specific known market events and trends, industry

data and forecasted customer buying and payment patterns"; (3) the Company was not complying

with GAAP requirements and did not include "[t]he amount of variable consideration . . . in the

transaction price only to the extent that it is probable that a significant reversal in the amount of

the cumulative revenue recognized will not occur in a future period"; (4) as a result, the Company

faced a significant risk of material revenue reversals due to material overstatements of revenue

and Adjusted EBITDA and improperly recognized $12.4 million in revenue; and (5) the Company did not "regularly review all reserves and update them at the end of each reporting period as needed." As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

### March 10, 2022 Form 8-K

205.   On March 10, 2022, the Company filed a Form 8-K with the SEC which announced the Company's financial results for the fourth quarter of 2021 and 2021 Fiscal Year. The Form 8-K reported Pain Treatments vertical revenue of $62.7 million, total net sales of $130.4 million, a net loss of $1.9 million, and Adjusted EBITDA of $28.5 million.

206.   The statements in ¶ 205 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Bioventus did not have effective internal controls over financial reporting and violated GAAP; (2) Bioventus's Pain Treatments vertical revenue and total net sales for the fourth quarter of 2021 was overstated by $2.2 million; (3) Bioventus's net loss for the fourth quarter of 2021 was understated by $2.2 million; (4) Bioventus's Adjusted EBITDA was overstated by $2.2 million; (5) the Red Report issued in September 2021 explicitly stated the Company's internal controls failed and the Company could not and did not accurately forecast or calculate rebates; (6) The Red Report was given directly to Defendants Reali and Stalnecker, and disseminated and discussed with other Individual Defendants; and (7) as a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and Adjusted EBITDA. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

### March 10, 2022 Earnings Call

207.    That same day, on March 10, 2022, the Company held an earnings call to discuss Bioventus's fourth quarter of 2021 financial results. During the call, an analyst from Morgan Stanley asked the question, "[Y]ou just mentioned the HA market remains very strong. Reimbursement is robust. It's – heard some concerns from investors that Medicare might be potentially cutting prices in the not-too-distant future. But can you maybe spend a moment there, talk about how Bioventus might be better situated versus competitors? And any idea of precise timing for or implementation of the pricing cuts?" Defendant Reali answered:

> Yes. Thanks for the question, Drew, on that. We've looked at this very carefully, and this is not a Medicare cut per se, but it's focused on ASP reporting and ASP reimbursement, average selling price reimbursement. One of the things that we've historically done at Bioventus in our HA business is focused on market access. And what that means is having specific contracts with insurance carriers such as United Healthcare, the largest private carrier in the country today. And with those contracts, gives us unfettered access to accounts and the ability to cross sell to what we call non-contracted, non-United patients. But we also spend a lot of money relative to getting those contracts through rebates back to insurance companies where we have that unfettered access in that exclusive contract. So when we look at this analysis for us, and this is specific to Bioventus, I can't speak for other countries or other companies, rather, it's a net-neutral for Bioventus. While we may lose a little on the ASP reimbursement, we gain by paying less rebates because of that reimbursement change.

> So for Bioventus, it provides us with basically a balanced footing on the HA reimbursement side. We may see some choppiness as we go through this, and we're projecting this would occur in the third quarter this year. But we feel that choppiness will be very short-lived as we work through the ASP reimbursement and, of course, the rebate change associated with that, that we pay back to insurance companies.

208.    The statements in ¶ 207 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Bioventus did not have effective internal controls over financial reporting and violated GAAP; (2) The effect of Medicare price changing was not "net-neutral" for Bioventus and the Company was not gaining anything "by paying less rebates because

of that reimbursement change"; (3) Bioventus was unable to effectively monitor where its HA products were shipped; (4) Bioventus did not negotiate reduced rebates to mitigate the effects of lower prices for HA products and reimbursements; and (5) as a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and Adjusted EBITDA and improperly recognized $12.4 million in revenue. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

### March 11, 2022 Form 10-K

209.    On March 11, 2022, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K was signed by Defendants Reali, Anglum, Hawkins, Beyer, Cowdy, Ladone, Heath, Neels, Nohra, Stalnecker, and Sutter, and contained SOX certifications, signed by Defendants Reali and Anglum, attesting to the accuracy of the financial statements contained in the 2021 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

210.    The 2021 10-K reported the following regarding Bioventus's revenue recognition practices:

### Revenue recognition

Sale of products . . . .

We recognize revenue generally at a point in time upon transfer of control of the promised product to customers in an amount that reflects the consideration we expect to receive in exchange for those products. We exclude taxes collected from customers and remitted to governmental authorities from revenues.

Revenues are recorded at the transaction price, which is determined as the contracted price net of estimates of variable consideration resulting from discounts, rebates, returns, chargebacks, contractual allowances, estimated third-party payer settlements, and certain distribution and administration fees offered in customer contracts and other indirect customer contracts relating to the sale of products. We

establish reserves for the estimated variable consideration based on the amounts earned or eligible for claim on the related sales. Where appropriate, these estimates take into consideration a range of possible outcomes, which are probability-weighted for relevant factors such as our historical experiences, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns. The amount of variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period. We regularly review all reserves and update them at the end of each reporting period as needed. There were no significant adjustments arising from the change in estimates of variable consideration for the years ended December 31, 2021 and 2020.

211.    The notes to the financial statements in the 2021 10-K reported the following regarding discounts and gross-to-net deductions:

**Discounts and gross-to-net deductions**

. . . The Company reduces revenue and records the reserve as a reduction to accounts receivable for the estimated discount and rebate at the expected amount the customer will earn, based on historical buying trends and forecasted purchases.

212.    The 2021 10-K stated the following regarding the sufficiency of Bioventus's internal controls and procedures:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Annual Report on Form 10-K. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2021.

**Management's Report on Internal Control over Financial Reporting . . . .**

In connection with the preparation and filing of this Annual Report, the Company's management, including our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2021, based on the framework set forth in "Internal Control—Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Our assessment of, and conclusion on, the effectiveness of internal control over financial reporting did not include Misonix and Bioness, both acquired by the

Company in 2021 and included in our 2021 consolidated financial statements. Misonix and Bioness are now wholly-owned subsidiaries of the Company and comprised approximately 51.2% and 6.4%, respectively, of total assets, and approximately 3.6% and 7.9%, respectively, of total net sales, of the Company's related consolidated financial statement amounts as of and for the year ended December 31, 2021. Based on its evaluation, the Company's management concluded that, as of December 31, 2021, the Company's internal control over financial reporting is effective.

213.     The statements in ¶¶ 209-212 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Bioventus did not have effective internal controls over financial reporting "as of December 31, 2021" and violated GAAP; (2) Bioventus's "disclosure controls and procedures were" not "effective at the reasonable assurance level as of December 31, 2021"; (3) the Red Report issued in September 2021 explicitly stated the Company's internal controls failed and the Company could not and did not accurately forecast or calculate rebates; (6) The Red Report was given directly to Defendants Reali and Stalnecker, and disseminated and discussed with other Individual Defendants; and (7) as a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and Adjusted EBITDA and improperly recognized $12.4 million in revenue. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

### *April 29, 2022 Proxy Statement*

214.     On April 29 2022, the Company filed the 2022 Proxy Statement with the SEC. Defendants Heath, Neels, Nohra, Beyer, Cowdy, Hawkins, Ladone, Stalnecker, and Sutter solicited the 2022 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

215.     The 2022 Proxy Statement called for Company shareholders to vote to, inter alia: (1) elect Defendants Heath, Neels, and Nohra to the Board; and (2) ratify the appointment of Grant

Thorton LLP as the Company's independent registered public accounting firm for the 2022 Fiscal Year.

216.    With respect to the Company's Code of Ethics, the 2022 Proxy Statement stated that: "We have a written Code of Compliance and Ethics that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. A current copy of the Code is posted on our website…In addition, we intend to post on our website all disclosures that are required by law or Nasdaq listing standards concerning any amendments to, or waivers from, any provision of the Code."

217.    Regarding the Board's "Role in Risk Oversight," the 2022 Proxy Statement states the following, in relevant part:

> One of the key functions of our Board of Directors is informed oversight of our risk management process. Our Board of Directors has delegated to the Audit and Risk Committee oversight of the Company's enterprise risk assessment and management processes, including oversight of the Company's financial and cybersecurity risks. Management quarterly presents to the Audit and Risk Committee on cyber and information security. Our Nominating and Corporate Governance Committee monitors the effectiveness of our Corporate Governance Guidelines. Our Compensation Committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking. Our Compliance, Ethics and Culture Committee is responsible for oversight of legal, compliance, and regulatory risks. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, our entire Board of Directors is regularly informed through committee reports about such risks.

218.    Defendants Heath, Neels, Nohra, Beyer, Cowdy, Hawkins, Ladone, Stalnecker, and Sutter caused the 2022 Proxy Statement to be false and misleading by failing to disclose that: (1) Bioventus did not have effective internal controls over financial reporting and violated GAAP; (2) The Red Report issued in September 2021 explicitly stated the Company's internal controls failed and the Company could not and did not accurately forecast or calculate rebates; (3) The Red Report

was given directly to Defendants Reali and Stalnecker, and disseminated and discussed with other Individual Defendants; (4) As a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and Adjusted EBITDA; (5) The effect of Medicare price changing was not "net-neutral" for Bioventus and the Company was not gaining anything "by paying less rebates because of that reimbursement change"; (6) Bioventus was unable to effectively monitor where its HA products were shipped; (7) Bioventus did not negotiate reduced rebates to mitigate the effects of lower prices for HA products and reimbursements; (8) although the Company claimed its directors and officers adhered to the Code of Ethics and that it would disclose waivers of the policy, the Individual Defendants violated the Code of Ethics either without waivers or without such waivers being disclosed; and (9) the Board, and its committees were not properly exercising their risk oversight functions, including their review of the risk exposures described, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

219.    As a result of Defendants Heath, Neels, Nohra, Beyer, Cowdy, Hawkins, Ladone, Stalnecker, and Sutter causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Heath, Neels, and Nohra to the Board, allowing them to continue to breach their fiduciary duties to the Company and; (2) ratify Grant Thornton LLP as the Company's independent registered public accounting firm for the 2022 Fiscal Year.

### May 9, 2022 Form 8-K

220.    On May 9, 2022, the Company filed a Form 8-K with the SEC which announced the Company's financial results for the first quarter of 2022. The Form 8-K reported Pain

Treatments vertical revenue of $52.1 million, total net sales of $117.3 million, a net loss of $14.8 million, and Adjusted EBITDA of $7.1 million.

221.    The statements in ¶ 220 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Bioventus did not have effective internal controls over financial reporting and violated GAAP; (2) Bioventus's Pain Treatments vertical revenue and total net sales for the first quarter of 2022 was overstated by $2.8 million; (3) Bioventus's net loss for the first quarter of 2022 was understated by $2.8 million; (4) Bioventus's Adjusted EBITDA was overstated by $2.7 million; (5) The Red Report issued in September 2021 explicitly stated the Company's internal controls failed and the Company could not and did not accurately forecast or calculate rebates; (6) The Red Report was given directly to Defendants Reali and Stalnecker, and disseminated and discussed with other Individual Defendants; and (7) as a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and Adjusted EBITDA. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

### *May 10, 2022 Earnings Call*

222.    On May 10, 2022, the Company held an earnings call to discuss Bioventus's first quarter of 2022 financial results. During the call, a Goldman Sachs Group, Inc. analyst asked the question, "[Y]ou touched on the potential pricing mechanism change here coming in the second half of the year. I think if you could maybe just provide a little bit more detail on sort of the mechanism of how that pricing change could affect your business. And any quantification you might be willing to sort of characterize over the next 12 months or as you annualize the potential pricing change." Defendant Reali responded:

Sure. So the way we look at this is we do expect the ASP reporting to happen. It's not 100%, but we think it's likely in the second half of the year. And that impacts Medicare pricing specifically to ASP reporting. But on the other side of the equation is our contracted business where we pay rebates. Very specifically, with contracts like United and Cigna, we pay rebates. Within our contracts with these payers, we have very specific clauses to reduce the rebates based on ASP reporting.

So when we do our analysis of volume in our business, volume of syringes, the actual reduction in rebates offsets any reduction in reimbursement, specifically based on ASP reporting. We've run these calculations very carefully, and we feel strongly that not only will we be basically neutral through this process, but we can gain market share as we go forward in the medium term.

223.    The statements in ¶ 222 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Bioventus did not have effective internal controls over financial reporting and violated GAAP; (2) The effect of the "actual reduction in rebates" did not "offset[] any reduction in reimbursement" for Bioventus; (3) Bioventus did not "run these calculations very carefully" by running an "analysis of volume in our business, volume of syringes"; (4) Bioventus was unable to effectively monitor where its HA products were shipped; (5) Bioventus did not negotiate reduced rebates to mitigate the effects of lower prices for HA products and reimbursements; and (6) as a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and Adjusted EBITDA and improperly recognized $12.4 million in revenue. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

### *May 11, 2022 Form 10-Q*

224.    On May 11, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended April 2, 2022 (the "1Q22 10-Q"). The 1Q22 10-Q was signed by Defendant Singleton, and contained SOX certifications, signed by Defendants Reali and Singleton, attesting to the accuracy of the financial statements contained in the 1Q22 10-Q, the disclosure of

any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

225.   The 1Q22 10-Q stated the following regarding revenue recognition:

**Revenue recognition**

Our policies for recognizing sales have not changed from those described in the Company's 2020 Annual Report on Form 10-K.

226.   The 1Q22 10-Q stated the following regarding the sufficiency of Bioventus's internal controls and procedures:

***Evaluation of Disclosure Controls and Procedures***

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of April 2, 2022.

227.   The statements in ¶¶ 224-226 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Bioventus did not have effective internal controls over financial reporting "as of April 2, 2022" and violated GAAP; (2) Bioventus's "disclosure controls and procedures were" not "effective at the reasonable assurance level as of April 2, 2022"; (3) the Red Report issued in September 2021 explicitly stated the Company's internal controls failed and the Company could not and did not accurately forecast or calculate rebates; (6) The Red Report was given directly to Defendants Reali and Stalnecker, and disseminated and discussed with other Individual Defendants; and (7) as a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and Adjusted EBITDA and improperly

recognized $12.4 million in revenue. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

### *August 10, 2022 Form 8-K*

228.    On August 10, 2022, the Company filed a Form 8-K with the SEC which announced the Company's financial results for the second quarter of 2022. The Form 8-K reported Pain Treatments vertical revenue of $63.9 million, total net sales of $140.3 million, a net loss of $8.0 million, and Adjusted EBITDA of $22.9 million.

229.    The statements in ¶ 228 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Bioventus did not have effective internal controls over financial reporting and violated GAAP; (2) Bioventus's Pain Treatments vertical revenue and total net sales for the second quarter of 2022 was overstated by $3.4 million; (3) Bioventus's net loss for the second quarter of 2022 was understated by $3.4 million; (4) Bioventus's Adjusted EBITDA was overstated by $3.4 million; (5) The Red Report issued in September 2021 explicitly stated the Company's internal controls failed and the Company could not and did not accurately forecast or calculate rebates; (6) The Red Report was given directly to Defendants Reali and Stalnecker, and disseminated and discussed with other Individual Defendants; and (7) as a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and Adjusted EBITDA and improperly recognized $12.4 million in revenue. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

### *August 11, 2022 Earnings Call*

230.    On August 11, 2022, the Company held an earnings call to discuss Bioventus's second quarter of 2022 financial results. Defendant Reali began the call by stating the following in his opening remarks:

> As we highlighted on previous earnings calls, reimbursement for HA shifted from wholesale acquisition cost to average selling price at the end of June. Given the sales mix of our HA portfolio, this new pricing dynamic has not fundamentally impacted our overall growth opportunity. As expected, we have been able to lower our reimbursement rebate rates on all of our preferred contracts with private payers, which has offset lower pricing for other areas of our HA business.
>
> The modifications to these agreements are consistent with our modeling exercises done over the past several months as we prepared for this new environment.

231.    The statements in ¶ 230 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Bioventus did not have effective internal controls over financial reporting and violated GAAP; (2) Bioventus had not "been able to lower our reimbursement rebate rates on all of our preferred contracts with private payors"; (3) Bioventus did not "offset lower pricing for other areas of our HA business"; (4) The "modifications to these agreements" were not "consistent with our modeling exercises done over the past several months as we prepared for this new environment" because Bioventus did not have adequate internal controls to accurately forecast these changes; (5) Bioventus was unable to effectively monitor where its HA products were shipped; (6) Bioventus did not negotiate reduced rebates to mitigate the effects of lower prices for HA products and reimbursements; and (7) as a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and Adjusted EBITDA and improperly recognized $12.4 million in revenue. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

232.    Also during the second quarter of 2022 earnings call, a Craig-Hallum Capital Group LLC analyst asked, "[J]ust on the HA pricing. What have you seen in July and August here with the changes around CMS? Are you seeing HA volumes and the price that you could charge the docs relatively consistent with the first half?" Defendant Reali responded:

> Well, we did see, based on ASP reporting a dip in our pricing for DUROLANE and GELSYN, in particular, [Supartz] was already ASP reported. But as we've talked about that has been countered by our rebate adjustments that per our planning, and we're very pleased with the results of this and it's a credit to our market access team. We've been able to adjust all of our rebates on our contracted business, which is a significant portion to a lower amount that net effect, Alex, negates any impact on the ASPs because we're paying less rebates on our contracted business.
>
> So as we've modeled that over the past several months that turned out exactly the way we thought it would. So the first phase of this has gone well.

233.    The statements in ¶ 232 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Bioventus did not have effective internal controls over financial reporting and violated GAAP; (2) Bioventus's transition to ASP had not "turned out exactly the way we thought it would" because of "model[ing] that over the past several months" since the Company did not accurately model ASP; (3) Bioventus had not "been able to adjust all of our rebates on our contracted business . . . to a lower amount" or to "negate[] any impact on the ASPs"; (4) The "dip in our pricing for Durolane and Gelsyn" was not "countered by our rebate adjustments [] per our planning" because Bioventus did not have adequate internal controls to accurately forecast these changes; (5) Bioventus was unable to effectively monitor where its HA products were shipped; (6) Bioventus did not negotiate reduced rebates to mitigate the effects of lower prices for HA products and reimbursements; and (7) as a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and

Adjusted EBITDA and improperly recognized $12.4 million in revenue. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

234.    Later during the call, a Morgan Stanley analyst offered another question regarding HA product performance, asking, "[J]ust to go back to the HA component for a moment. I know we've kind of talked about this before. But I was hoping we could maybe get a better sense of what's embedded in guidance from a volume perspective. And if you are – I think you mentioned maybe some volatility, but are you seeing any initial signs of like surgeon preference changes or anything within the portfolio or within the HA market?" Defendant Reali replied:

> So what's built into our forecast going forward is continued volume growth in our HA business as we've seen before because we've seen no indication of impact on the volume and that's certainly something we'll take advantage of. And as I talked about in the prior question on HA, a lot of our ASP impact, all of our ASP impact has been negated by our ability to renegotiate our rebates on a contracted business, which is a significant portion and that has been true to our model and it's something that we're excited about.

235.    The statements in ¶ 234 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Bioventus did not have effective internal controls over financial reporting and violated GAAP; (2) "All of" Bioventus's "ASP impact" was not "negated by our ability to renegotiate our rebates on a contracted business"; (3) After the price change to ASP, Bioventus's performance was not "true to our model" (4) Bioventus had witnessed an "indication of impact on the volume"; (5) Bioventus was unable to effectively monitor where its HA products were shipped; (6) Bioventus did not negotiate reduced rebates to mitigate the effects of lower prices for HA products and reimbursements; and (7) as a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and

Adjusted EBITDA and improperly recognized $12.4 million in revenue. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

### *August 12, 2022 Form 10-Q*

236.     On August 12, 2022, the Company filed its quarterly report with the SEC for the period ended July 2, 2022 (the "2Q22 10-Q"). The 2Q22 10-Q was signed by Defendant Singleton, and contained SOX certifications, signed by Defendants Reali and Singleton, attesting to the accuracy of the financial statements contained in the 2Q22 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

237.     The 2Q22 10-Q stated the following regarding revenue recognition:

**Revenue recognition**

Our policies for recognizing sales have not changed from those described in the Company's 2020 Annual Report on Form 10-K.

238.     The 2Q22 10-Q stated the following regarding the sufficiency of Bioventus's internal controls and procedures:

### *Evaluation of Disclosure Controls and Procedures*

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of July 2, 2022.

239.     The statements in ¶¶ 236-238 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Bioventus did not have effective internal controls over financial reporting "as of July 2, 2022" and violated GAAP; (2) Bioventus's "disclosure controls

and procedures were" not "effective at the reasonable assurance level as of July 2, 2022"; (3) the Red Report issued in September 2021 explicitly stated the Company's internal controls failed and the Company could not and did not accurately forecast or calculate rebates; (6) The Red Report was given directly to Defendants Reali and Stalnecker, and disseminated and discussed with other Individual Defendants; and (7) as a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and Adjusted EBITDA and improperly recognized $12.4 million in revenue. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

### *September 14, 2022 Morgan Stanley Global Healthcare Conference*

240.    On September 14, 2022, Defendant Singleton attended the Morgan Stanley Global Healthcare Conference on behalf of Bioventus. During the conference, an analyst from Morgan Stanley asked Defendant Singleton, "[E]arlier in the year, there was the big debate about what Medicare changes in pricing regime will kind of [do] to the HA market. And I think if I kind of go back and look at your updated guidance, I mean, it sounds like you're kind of baking in some potential disruptions in the marketplace. But for 2 months, roughly 2 months after the change, I mean, are you seeing anything from an underlying utilization perspective that's giving you concern that there is going to be disruption in the HA market as a result of the change?" Defendant Singleton replied:

> Yes, obviously I'm new to the HA market, but I will tell you, I really have a lot of confidence in the team that we have navigating us through that. And so far, for the first 2 months, it's progressing as we had it expected and have modeled into our numbers. And so that's kind of as expected.

The analyst asked a follow up question, "[I]s there any disruption though that was kind of baked in there?" Defendant Singleton replied:

> Yes. I guess I guess what adjective you want to put on it disrupted or choppiness, Yes, we expect a little bit of choppiness in the back half as we make the transition from WAC to ASP, but it's kind of all built into our models.

241.    The statements in ¶ 240 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Bioventus did not have effective internal controls over financial reporting and violated GAAP; (2) The shift to ASP had not "progress[ed] as we had it [sic] expected and have modeled into our numbers" and did not unfold "kind of as expected"; (3) The shift to ASP and its results were not "all built into our models"; (4) Bioventus was unable to effectively monitor where its HA products were shipped; (5) Bioventus did not negotiate reduced rebates to mitigate the effects of lower prices for HA products and reimbursements; and (6) as a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and Adjusted EBITDA and improperly recognized $12.4 million in revenue. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

242.    Later during the conference, an analyst from Morgan Stanley asked a question pertaining to Bioventus's contractual situation with insurance companies after the Medicare pricing change, asking, "[Y]ou have UnitedHealthcare and Cigna, just post kind of this regime change or Medicare pricing change? I mean, is there additional opportunity? Or are you even looking for more exclusive contracts with commercial insurers. Is that more important now than it was before kind of Medicare pricing changed?" Defendant Singleton replied:

> I think we're going to – we feel really good. I mean, Cigna has just come on. I mean between Cigna and United that gives us really access to preferred lives and a lot of leverage in the market. We believe that's going to help us going through the WAC to ASP transition, we have adjusted our contract with them from the standpoint of the rebates favorability that was associated with the WAC going to the ASP world.

243.    The statements in ¶ 242 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Bioventus did not have effective internal controls over financial reporting and violated GAAP; (2) Bioventus had not "adjusted our contract with them from the standpoint of the rebates favorability that was associated with the WAC going to the ASP world"; (3) Bioventus was unable to effectively monitor where its HA products were shipped; (4) Bioventus did not negotiate reduced rebates to mitigate the effects of lower prices for HA products and reimbursements; and (5) as a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and Adjusted EBITDA and improperly recognized $12.4 million in revenue. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

***November 8, 2022 Earnings Call***

244.    On November 8, 2022, the Company held an earnings call to discuss Bioventus's third quarter of 2022 financial results. Defendant Reali began the call by stating the following in his opening remarks:

> While we expect to see continued pressure on GELSYN revenue through the first half of 2023, we believe that the mechanics of ASP reporting will resolve this issue as full ASP reporting takes effect and GELSYN pricing stabilizes to a more competitive position. As a reminder, ASP reporting is based on a 4-quarter look back. While both GELSYN and DUROLANE moved from WAC to ASP pricing, this dynamic did not impact DUROLANE, which maintained strong double-digit growth for the quarter.

245.    The statements in ¶ 244 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Bioventus did not have effective internal controls over financial reporting and violated GAAP; (2) "The mechanics of ASP reporting" would not "resolve

this issue as full ASP reporting takes effect and Gelsyn pricing stabilizes to a more competitive position"; (3) The shift from WAC to ASP pricing did impact Durolane; (4) Bioventus was unable to effectively monitor where its HA products were shipped; (5) Bioventus did not negotiate reduced rebates to mitigate the effects of lower prices for HA products and reimbursements; and (6) as a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and Adjusted EBITDA and improperly recognized $12.4 million in revenue. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

246.     Later in the earnings call, an analyst from Morgan Stanley asked Defendant Reali, "[A]s you're looking at these issues, and I get that some of these are transitory, what's giving you really the confidence on the visibility to maybe label some of these as transitory. And maybe specifically with the HA side, you talked about being like kind of mid next year until these kind of resolved. But again, kind of what gives you confidence –that level of confidence and that there's not broader implications for the other parts of the HA portfolio to come?" Defendant Reali replied:

> So we model this out, and we have a full understanding of where our pricing is going to go over the next year with all 3 HA products, DUROLANE, GELSYN as well as SUPARTZ. So if you look at it that way, we have a really good understanding of that as well as the market dynamics.

247.     The statements in ¶ 246 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Bioventus did not have effective internal controls over financial reporting and violated GAAP; (2) Bioventus did not "have a full understanding of where our pricing is going to go over the next year"; (3) Bioventus did not "have a really good understanding of" pricing or "market dynamics" nor "know the markets" or "where the pricing is going to be"; (4) Bioventus did not know where Durolane's "pricing is going relative to ASP"; (5)

Bioventus was unable to effectively monitor where its HA products were shipped; (6) Bioventus did not negotiate reduced rebates to mitigate the effects of lower prices for HA products and reimbursements; and (7) as a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and Adjusted EBITDA and improperly recognized $12.4 million in revenue. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

### **The Truth Begins to Emerge as False and Misleading Statements Continue**

***November 8, 2022 Form 8-K***

248.    On November 8, 2022, the Company filed a Form 8-K with the SEC which announced the Company's financial results for the third quarter of 2022. The Form 8-K reported Pain Treatments vertical revenue of $60.5 million, total net sales of $137.1 million, and Adjusted EBITDA of $22.7 million. The total net sales and EBITDA figures fell significantly below analysts' estimates of $141.6 million and $25.3 million. Bioventus also reported $55.419 million in net sales for the Pain Treatments vertical. The Company revealed that demand for Gelsyn cratered, dipping revenue by 13% quarter over quarter for the Paint Treatments vertical. Because of these poor results, Bioventus reduced guidance for net sales from a previous range of $547.5 million to $562.5 million to $527 million to $532 million.

***November 8, 2022 Earnings Call***

249.    That same day, Bioventus hosted an earnings call to discuss various problems it was facing regarding the Company's poor third quarter of 2022 performance. During the call, Defendant Reali conceded that the "revenue shortfall" was "primarily . . . attributed to transitory headwinds related to GELSYN." He further stated the revenue shortfall was from "higher than normal rebate claims due to unexpected prior period rebate charges from a private payer who found

errors in their earlier claims reporting" and "the recent change in pricing to average selling price, or ASP, from wholesale acquisition cost, or WAC."

250. However, Defendant Reali made materially false and misleading statements during the earnings call. He claimed that the lower pricing "dynamic did not impact Durolane" and that the Company had a "full understanding" of HA product pricing, stating that ""So we model this out, and we have a full understanding of where our pricing is going to go over the next year . . . . We certainly know the competition. We know the markets and we know where the pricing is going to be."

251. On this news, the Company's share price dropped $4.06, or 57.5%, from a close of $7.06 per share on November 7, 2022, to close at $3.00 per share on November 8, 2022.

252. Analysts remarked that this disclosure was "thesis changing" and that it was "clear the shift to ASP reporting from WAC[] has impacted the commercial stability here; this comes in sharp contrast to prior management commentary that called for ASP declines to be offset by reduced rebate levels."

***November 16, 2022 Notification of Inability to Timely File Form 10-Q***

253. On November 16, 2022, the truth continued to emerge when the Company announced it would be unable to timely file its Form 10-Q with the SEC for the third quarter of 2022. The Company also revealed that Bioventus may have to take "an impairment charge in the range of $185 million to $205 million" because of "the recent decline in the Company's market capitalization subsequent to its previously announced financial results for the third quarter of 2022." In this disclosure, Bioventus further revealed that the Company was "seeking resolution" of the validity of a "revised invoice" for "rebate claims from a large private payer in relation to our Pain Treatments vertical," and that the "recognition of additional rebates may impact

Bioventus's recently announced revenue guidance." In addition, the Company admitted that its "internal controls related to the timely recognition of quarterly rebates were inadequate specifically for the period ended October 1, 2022." Bioventus also cryptically stated that the Company was "evaluating whether [it] will be able to meet all of its financial obligations as they come due within one year . . . ."

254.    On this news, the Company's stock price fell $1.00 per share, or 33%, from a closing price of $2.97 per share on November 16, 2022 to close at $1.97 per share on November 17, 2022.

255.    Soon after this news reached the market, analysts at Morgan Stanley reported that the Company "received an invoice for rebate claims" which Morgan Stanley expected "will be a multiple of the ~$2m headwind stated on the 3Q22 call for '22 guidance." Accordingly, Morgan Stanely removed its rating and price per share target for Bioventus's Class A common stock, citing the "potential risk of going concern," and further stated that the Company was "very much a 'show me' story in need of a restructuring/turnaround to restore investor confidence."

### *November 21, 2022 Form 10-Q*

256.    On November 21, 2022, the Company belatedly filed its quarterly report on Form 10-Q with the SEC for the period ended October 1, 2022 (the "3Q22 10-Q"). The 3Q22 10-Q was signed by Defendant Singleton, and contained SOX certifications, signed by Defendants Reali and Singleton, attesting to the accuracy of the financial statements contained in the 3Q22 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

257.    The 3Q22 10-Q revealed that rebate claims for the third quarter of 2022 had caused an $8.4 million reduction in revenue that was previously reported for the third quarter of 2022,

along with a $4.3 million reduction in Adjusted EBITDA. The Company chalked up the $8.4 million revenue reversal to "open rebates and accruals." Notably, this reversal solidified a *16% year-over-year revenue decline of $8.953 million in Pain Treatments vertical revenues* in the United States. Bioventus revealed that the decline in Pain Treatments revenues was "due to more treatments being sold under contracts with major issuers at lower prices and price competition within the osteoarthritic joint pain treatment market."

258.    In other words, the 3Q22 10-Q admitted that "lower prices" and "price competition" were sapping Bioventus's revenues, which contradicts Defendants Reali and Singleton's statements that ASP pricing is "net-neutral" for Bioventus, that "all of our ASP impact has been negated," and that Bioventus saw "no indication of impact on the volume."

259.    The 3Q22 10-Q also revealed a $189.2 million "non-cash impairment charge required by U.S. generally accepted accounting principles [GAAP]" "due to the recent decline in our market capitalization," indicating that Bioventus's overall business was suffering from the ASP price changes and internal financial control failures.

260.    The 3Q22 10-Q also commented on Bioventus's internal controls issues, stating that the "Company's management, including our Chief Executive Officer and Chief Financial Officer, identified a material weakness related to the Company's internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected and corrected on a timely basis."

261.    Specifically, the 3Q22 10-Q admitted that Bioventus's "internal control over financial reporting was not performed at a sufficient level of precision to ensure that the third

quarter 2022 rebates accrual was complete and accurate." For the first time, Bioventus conceded that when it received the multi-million-dollar invoice from United, "there were not processes in place to ensure it was reviewed timely in order to update the [third quarter rebates] accrual."

262.    The 3Q22 10-Q also revealed that Bioventus's $8.4 million revenue drop was "related to the rebates accrual adjustment for 2022 and [sic] cascading effect on future revenue projections materially impacted the Company's evaluation of its ability to meet debt covenants, resulting in liquidity and going concern disclosures in the" 3Q22 10-Q. The 3Q22 10-Q explained that recent "conditions and events raise substantial doubt about the Company's ability to continue as a going concern."

263.    On this news, the Company's stock price fell $0.07 per share, or 3.7%, from a closing price of $1.88 per share on November 21, 2022 to close at $1.81 per share on November 22, 2022.

264.    The day after this news reached the market, analysts at Craig-Hallum issued a report stating, "[W]e learn there are in-fact more errors in store and are moving to the sidelines until faith in financials/operating business can be restored and hard decisions around BVS' future are made." Craig-Hallum put Bioventus's stock on a "Hold" rating and stated that the main cause of the "restatements" was "the rebate snafu that appeared in Q3 where BVS was receiving too high of HA payments from an insurer for at least a year – this amount was incorrect." The report further stated that "The rebate question above does add questions to the financial infrastructure backbone at BVS and if more 'rebate adjustments' are necessary elsewhere."

### *January 11, 2023 JPMorgan Healthcare Conference*

265.    On January 11, 2023, Defendant Reali attended the JPMorgan Healthcare Conference on behalf of Bioventus. During the conference, an analyst from JPMorgan began the

Q&A session of the conference by asking, "If we do start with the short term, there's been some disruption in the HA market. They switched how they measure pricing, and it's led to a market decline, not just with you but also across your competitors. So maybe spend a minute there exactly what's happening? How much of an impact it's have on Bioventus and when it should resolve?" Defendant Reali replied:

> First of all, with DUROLANE, we have seen sustained double-digit volume growth and that has counteracted any impact on reduction of the transfer price from wholesale acquisition to average selling price.

266.    The statements in ¶¶ 260 and 265 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Bioventus did not have effective internal controls over financial reporting and violated GAAP; (2) Bioventus did not see "sustained double-digit volume growth" with Durolane that "counteracted any impact on reduction of the transfer price from wholesale acquisition to average selling price"; (3) Bioventus was unable to effectively monitor where its HA products were shipped; (4) Bioventus did not negotiate reduced rebates to mitigate the effects of lower prices for HA products and reimbursements; and (5) as a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and Adjusted EBITDA. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

### The Truth Fully Emerges

#### *March 31, 2023 Press Release*

267.    On March 31, 2023, the truth was fully revealed when the Company issued a press release attached to a Form 8-K revealing its fourth quarter of 2022 and 2022 Fiscal Year results. In the press release, Defendant Reali stated, "Our results reflect additional pressure in our Pain

Treatments vertical, primarily due to additional rebate claims previously not billed to us from a private payer, which offset the double-digit growth we are seeing in the Surgical Solutions vertical."

268.    The press release reported Bioventus's fourth quarter of 2022 net sales, stating, "Total net sales were $125.8 million compared to $130.4 million for the fourth quarter of 2021, a decrease of $4.6 million, or 3.5%, year-over-year, due to a decline in the Pain Treatments vertical, primarily driven by a decline in price resulting from higher than expected rebate claims[.]"

***March 31, 2023 Earnings Call***

269.    That same day, the Company held an earnings call to discuss the press release's revelations with investors. During the call, Defendant Reali stated that Bioventus's financial performance "fell below our expectations" because of "continued pressure across our HA franchise" and alleged "[u]nanticipated rebate claims from one private payer," "along with lower volume growth and decreased selling price across our HA business." He conceded that Bioventus received "rebate claims of approximately $4 million" from United, "which represent claims previously not billed to us. United Optum recently notified us that they had found these unbilled claims in their system through their internal audit of their rebate process in the fourth quarter, which revealed that they had underbilled us."

270.    Defendant Reali further admitted that due to the rebate claims, the Company's "average selling price, or ASP, for both Durolane and Gelsyn is now lower than previously expected," that the Company had "double-digit price loss" on Durolane, and that "Durolane revenue declined high single digits for the quarter." Defendant Reali also revealed that because the Company was struggling financially, the CartiHeal acquisition deal that stemmed back from July 2022 would have to be reversed, as Bioventus could no longer afford to make the large payments

to complete the transaction. Instead, he stated that Bioventus would have to pay $10 million to CartiHeal's former owners to cancel the acquisition.

### March 31, 2023 Annual Report

271.    Also on March 31, 2023, the Company filed the 2022 10-K. The 2022 10-K revealed that net sales for the Pain Treatments vertical for the United States dropped from $201.068 million in 2021 to $194.830 million in 2022, constituting a 3.1% drop. The 2022 10-K explained that the drop was "due to more treatments being sold under contracts with major insurers resulting from higher than expected rebate claims and price competition within osteoarthritic joint pain treatment market, partially offset with an increase in sales volume." The 2022 10-K further stated that "due to the manner in which rebates are calculated and paid under certain of our contracts with private payers, changes in the ASP for our HA viscosupplements may result in larger than expected rebates payments for the sale of these products."

272.    On this news, the Company's stock price fell $0.14 per share, or 11.6%, from a closing price of $1.21 per share on March 30, 2023 to close at $1.07 per share on March 31, 2023.

273.    Analysts from Craig-Hallum reacted on April 3, 2023, writing in a report that the "unexpected rebate claims from UnitedHealth in combination with a higher mix in contracted Pain revenues and transition to ASP from WAC drove a 20%+y/y decline in revenue." Likewise, Canaccord Genuity analysts wrote in another report on the same day that "BVS saw weakness in Pain Treatments as it continued to experience headwinds in its HA business. HA-specific issues include 1) another swath of unexpected rebate charges from a private payor and 2) reduced ASP given higher rebate claims from a higher volume or private payer contracts."

274.    Then, on April 5, 2023, just days after disclosing the truth, Bioventus announced that Defendant Reali had been informed by the Board on April 3, 2023 that "he would transition

from his role as" CEO. Instead of facing his firing, Defendant Reali resigned as CEO and as a director the following day, on April 4, 2023. Since Defendant Reali left Bioventus, Anthony P. Bihl III, Bioventus's former CEO from 2013 until 2020, came back as Interim CEO. In this role, Bihl has already sold off several businesses acquired during Defendant Reali's time as CEO in order to build cash levels and stabilize the Company.

## DAMAGES TO BIOVENTUS

275.    As a direct and proximate result of the Individual Defendants' conduct, Bioventus has lost and will continue to lose and expend many millions of dollars.

276.    Such losses include legal fees associated with the Securities Class Action filed against the Company and certain of the Individual Defendants, including the Company's Audit Committee Chairperson, and any internal investigations, including the Red Report audit investigation, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

277.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

278.    As a direct and proximate result of the Individual Defendants' conduct, Bioventus has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

279.     Plaintiff brings this action derivatively and for the benefit of Bioventus to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Bioventus, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 11(f) of the Securities Act and 21D of the Exchange Act.

280.     Bioventus is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

281.     Plaintiff is, and has been at all relevant times, a shareholder of Bioventus. Plaintiff will adequately and fairly represent the interests of Bioventus in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

282.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

283.     A pre-suit demand on the Board of Bioventus is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following eleven individuals: Defendants Hawkins, Beyer, Cowdy, Ladone, Heath, Neels, Nohra, Stalnecker, and Sutter (the "Director Defendants") along with nonparties John Bartholdson ("Bartholdson") and Anthony P. Bihl ("Bihl") (collectively, with the Director Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of the eleven Directors who are on the Board at the time of the filing of this complaint.

284.     Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes

they engaged in knowingly or recklessly to cause the Company to make and/or cause the Company to make false and misleading statements and omissions of material fact, whereby they failed to disclose that: (1) Bioventus did not have effective internal controls over financial reporting and violated GAAP; (2) The Red Report issued in September 2021 explicitly stated the Company's internal controls failed and the Company could not and did not accurately forecast or calculate rebates; (3) The Red Report was given directly to Defendants Reali and Stalnecker, and disseminated and discussed with other Individual Defendants; (4) As a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and Adjusted EBITDA; (5) The effect of Medicare price changing from WAC to ASP was not "net-neutral" for Bioventus; (6) Bioventus was unable to effectively monitor where its HA products were shipped; and (7) Bioventus did not negotiate reduced rebates to mitigate the effects of lower Medicare prices for HA products and reimbursements. These actions render the Director-Defendants unable to impartially investigate the charges and decide whether to pursue an action against themselves and the other perpetrators of this scheme.

285.    Notably, the Individual Defendants knew, and obfuscated the truth, that the Company's internal controls were woefully inadequate and posed a significant risk to the Company's ability to accurately estimate revenue and rebates. Indeed, even as early as May 2021, certain of the Individual Defendants were aware of the Company's failing internal controls and lack of systems and procedures for analyzing, monitoring, and recording financial performance. As set forth herein, the Director Defendants had actual knowledge of the internal control failures, financial reporting problems and the false and misleading statements obscuring these problems. As detailed above, several former employees described the severity of the internal control issues plaguing Bioventus. As the former employees state, the Red Report, which detailed the Company's

93

extensive internal controls failures and suggested ways to fix them, was delivered to Defendants Reali, Anglum, and Stalnecker by September 2021. The Red Report was placed on the agenda of a subsequent Board Audit and Risk Committee meeting. Nevertheless, none of the Director Defendants took any action to remediate these glaring issues facing Bioventus, and instead, made positive representations to the investing public to the contrary.

286.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

287.    Additional reasons that demand on Defendant Stalnecker is futile follow. Defendant Stalnecker has served as a Company director and as the chair of the Audit and Risk Committee since September 2020. Defendant Stalnecker also receives handsome compensation for her role as a Company director and chair of the Audit and Risk Committee. As a trusted Company director and the chair of the Audit and Risk Committee, Defendant Stalnecker conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Stalnecker failed in the oversight duties she was required to conduct as a member of the Audit and Risk Committee; she was aware of the Company's internal control failures and did not take adequate steps to resolve the problem.  This is even more alarming considering her

extensive background in finance and auditing. Furthermore, Defendant Stalnecker solicited the 2022 Proxy Statement and personally signed the Registration Statement, 2020 10-K and 2021 10-K, which contained false and misleading statements. She even signed the 2021 10-K, affirming that the Company's internal controls were effective, despite receiving the Red Report months earlier and despite knowing Bioventus's glaring internal control failures were not remediated. Moreover, Defendant Stalnecker is a defendant in the Securities Class Action. For these reasons, Defendant Stalnecker breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her his futile and, therefore, excused.

288.    Additional reasons that demand on Defendant Hawkins is futile follow. Defendant Hawkins has served as a Company director and as the chairperson of the Board since September 2020. He also serves as the chair of the Compliance, Ethics, and Culture Committee. Defendant Hawkins receives handsome compensation for his role as a Company director and chairperson of the Board. As a trusted Company director and the chairperson of the Board, Defendant Hawkins conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Hawkins solicited the 2022 Proxy Statement and personally signed the Registration Statement, 2020 10-K and 2021 10-K, which contained false and misleading statements. For these reasons, Defendant Hawkins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him his futile and, therefore, excused.

289.    Additional reasons that demand on Defendant Beyer is futile follow. Defendant Beyer has served as a Company director since October 2021. He also serves as a member of the

Audit and Risk Committee. Defendant Beyer also served as a member of the board of directors of Misonix, Inc. from May 2021 until October 2021, a company that Bioventus acquired in October 2021. Defendant Beyer receives handsome compensation for his role as a Company director. As a trusted Company director and member of the Audit and Risk Committee, Defendant Beyer conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Beyer solicited the 2022 Proxy Statement and personally signed the 2021 10-K, which contained false and misleading statements. For these reasons, Defendant Beyer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him his futile and, therefore, excused.

290.    Additional reasons that demand on Defendant Cowdy is futile follow. Defendant Cowdy has served as a Company director since September 2020. He also serves as a member of the Nominating and Corporate Governance Committee. He also has served as the Chief Business Development and Corporate Affairs Officer for Smith & Nephew plc, a medical equipment manufacturing company, since 2018. Previously and since joining Smith & Nephew in June 2008, he served as Executive Vice President of Business Development and Corporate Affairs, Head of Corporate Affairs and Strategic Planning, Group Director of Corporate Affairs and Director of Investor Relations. As a trusted Company director, Defendant Cowdy conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Cowdy solicited the 2022 Proxy Statement and personally signed the Registration

Statement, 2020 10-K and 2021 10-K, which contained false and misleading statements. For these reasons, Defendant Cowdy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him his futile and, therefore, excused.

291.    Additional reasons that demand on Defendant Ladone is futile follow. Defendant Ladone has served as a Company director since July 2021. She also serves as a member of the Audit and Risk Committee and the Compensation Committee. As a trusted Company director and member of the Audit and Risk Committee, Defendant Ladone conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Ladone solicited the 2022 Proxy Statement and personally signed the 2021 10-K, which contained false and misleading statements. For these reasons, Defendant Ladone breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

292.    Additional reasons that demand on Defendant Heath is futile follow. Defendant Heath has served as a Company director since January 2022. She also serves as a member of the Compliance, Ethics, and Culture Committee and the Corporate Governance Committee. As a trusted Company director, Defendant Heath conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Heath solicited the 2022 Proxy Statement and personally signed the 2021 10-K, which contained false and misleading statements. For these reasons, Defendant Heath breached her fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

293.    Additional reasons that demand on Defendant Neels is futile follow. Defendant Neels has served as a Company director since September 2020. He also serves as a member of the Compliance, Ethics, and Culture Committee and the Corporate Governance Committee. Since August 2006, Defendant Neels has been with EW Healthcare, a healthcare growth equity and venture capital firm, which Defendant Sutter founded in 1985. Since 2013, Defendant Neels has served as Operating Partner of EW Healthcare. As a trusted Company director, Defendant Neels conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Neels solicited the 2022 Proxy Statement and personally signed the Registration Statement, 2020 10-K and 2021 10-K, which contained false and misleading statements. For these reasons, Defendant Neels breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

294.    Additional reasons that demand on Defendant Nohra is futile follow. Defendant Nohra has served as a Company director since September 2020. He also serves as the chair of the Compensation Committee. As a trusted Company director, Defendant Nohra conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Nohra solicited the 2022 Proxy Statement and personally signed the Registration

Statement, 2020 10-K and 2021 10-K, which contained false and misleading statements. For these reasons, Defendant Nohra breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

295.    Additional reasons that demand on Defendant Sutter is futile follow. Defendant Sutter has served as a Company director since September 2020. He also serves as the chair of the Nominating and Corporate Governance Committee. Defendant Sutter founded HW Healthcare, the healthcare venture capital firm that holds 16.6% of the total voting power of Bioventus and where Defendant Neels has served as Operating Partner since 2013. As a trusted Company director, Defendant Sutter conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Sutter solicited the 2022 Proxy Statement and personally signed the Registration Statement, 2020 10-K and 2021 10-K, which contained false and misleading statements. For these reasons, Defendant Sutter breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

296.    Additional reasons that demand on the Board is futile follow.

297.    The Director Defendants have longstanding business and personal financial relationships with each other that preclude them from acting independently and in the best interests of the Company and its shareholders. For instance, Defendant Sutter founded HW Healthcare in 1985, a venture capital firm that, since Bioventus's IPO, holds 16.6% of the total voting power of Bioventus. Defendant Neels has served as the Operating Partner of HW Healthcare for over 10 years, dating back to 2013. Accordingly, Defendant Neels receives his primary compensation from

HW Healthcare. For this reason, Defendant Neels and Sutter have personal and conflicting financial interests and cannot impartially consider a demand against each other or the other Director Defendants. Similarly, Defendant Cowdy has worked for Smith & Nephew plc since June 2008, a company that holds 28.1% of the total power of Bioventus. Defendant Cowdy has held a variety of position at Smith & Nephew plc, including Executive Vice President of Business Development and Corporate Affairs, Head of Corporate Affairs and Strategic Planning, Group Director of Corporate Affairs and Director of Investor Relations. He currently serves as Smith & Nephew plc's Chief Business Development and Corporate Affairs Officer. Because taking action against Bioventus would potentially harm Smith & Nephew plc (and through Smith & Nephew plc, Defendant Cowdy) financially, Defendant Cowdy is unable to disinterestedly and independently consider commencing litigation against himself and the other Individual Defendants. For these reasons, Defendants Sutter, Neels, and Cowdy each have longstanding personal and financial interests and cannot impartially consider a demand against themselves or the other Director Defendants.

298.    Defendants Stalnecker, Beyer and Ladone served as members of the Audit and Risk Committee during the Relevant Period. In violation of the Charter, Defendants Stalnecker, Beyer and Ladone failed to adequately exercise their risk management and risk assessment functions and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. In particular, Defendant Stalnecker, as chairperson of the Audit and Risk Committee, was personally given the Red Report which outlined Bioventus's internal control failures over financial reporting, including the Company's inability to accurately calculate revenue, rebates, and rebate accruals. Although armed with this knowledge, she failed to act to remediate the Company's glaring internal control failures

over financial reporting. Likewise, Defendants Beyer and Ladone were made aware of these issues and discussed them during an Audit and Risk Committee presentation as well but failed to fulfill their function and exercise their duties to the Company. Thus, Defendants Stalnecker, Beyer and Ladone further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

299.    In violation of the Code of Ethics, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and the aiding and abetting thereof. In violation of the Code of Ethics, the Director Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Ethics and applicable laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

300.    Bioventus has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Bioventus any part of the damages Bioventus suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

301.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim

exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

302.   The acts complained of herein constitute violations of fiduciary duties owed by Bioventus's officers and directors, and these acts are incapable of ratification.

303.   The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Bioventus. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Bioventus, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

304.   If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Bioventus to sue the Individual Defendants named herein, since, if they

did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

305.     Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

306.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

307.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

308.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

309.     Under the direction and watch of the Individual Defendants, the 2022 Proxy Statement failed to disclose that: (1) Bioventus did not have effective internal controls over

financial reporting and violated GAAP; (2) The Red Report issued in September 2021 explicitly stated the Company's internal controls failed and the Company could not and did not accurately forecast or calculate rebates; (3) The Red Report was given directly to Defendants Reali and Stalnecker, and disseminated and discussed with other Individual Defendants; (4) As a result, the Company faced a significant risk of material revenue reversals due to material overstatements of revenue and Adjusted EBITDA; (5) The effect of Medicare price changing was not "net-neutral" for Bioventus and the Company was not gaining anything "by paying less rebates because of that reimbursement change"; (6) Bioventus was unable to effectively monitor where its HA products were shipped; (7) Bioventus did not negotiate reduced rebates to mitigate the effects of lower prices for HA products and reimbursements; (8) although the Company claimed its directors and officers adhered to the Code of Ethics and that it would disclose waivers of the policy, the Individual Defendants violated the Code of Ethics either without waivers or without such waivers being disclosed; and (9) the Board, and its committees were not properly exercising their risk oversight functions, including their review of the risk exposures described, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

310.    Moreover, the 2022 Proxy Statement failed to disclose that the Board's oversight and risk mechanisms were not adequate given the aforementioned misconduct and that the Code of Ethics was not complied with.

311.    The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were

material to Plaintiff and Company shareholders in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the election of directors.

312.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 Proxy Statement.

313.     Plaintiff on behalf of Bioventus has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

314.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

315.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Bioventus's business and affairs.

316.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

317.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Bioventus.

318.     In breach of their fiduciary duties owed to Bioventus, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) Bioventus did not have effective internal controls over financial reporting; (2) due to these widespread issues, the Company could not effectively monitor or calculate the amount of rebates nor the rebate amount that had to be deducted from revenue; (3) the Company was not complying with GAAP requirements and incorrectly reported $12.4 million in revenue; (4) as a result, the Company faced a significant risk of material

revenue reversals due to material overstatements of revenue and Adjusted EBITDA; and (5) the Company would be detrimentally affected by new Medicare regulations that lowered prices and reimbursement on HA products. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

319.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

320.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

321.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

322.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Bioventus's securities.

The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

323.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

324.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Bioventus has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

325.    Plaintiff on behalf of Bioventus has no adequate remedy at law.

### THIRD CLAIM
**Against Individual Defendants for Unjust Enrichment**

326.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

327.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Bioventus.

328.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Bioventus that was tied to the performance or artificially inflated valuation of Bioventus, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

329.    Plaintiff, as a shareholder and representative of Bioventus, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

330.    Plaintiff on behalf of Bioventus has no adequate remedy at law.

## FOURTH CLAIM
### Against Individual Defendants for Abuse of Control

331.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

332.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Bioventus, for which they are legally responsible.

333.    As a direct and proximate result of the Individual Defendants' abuse of control, Bioventus has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Bioventus has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

334.    Plaintiff on behalf of Bioventus has no adequate remedy at law.

## FIFTH CLAIM
### Against Individual Defendants for Gross Mismanagement

335.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

336.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Bioventus in a manner consistent with the operations of a publicly-held corporation.

337.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Bioventus has sustained and will continue to sustain significant damages.

338.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

339.    Plaintiff on behalf of Bioventus has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

340.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

341.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

342.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

343.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

344.    Plaintiff on behalf of Bioventus has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Reali, Singleton, Anglum, and Stalnecker for Contribution Under Section 11(f) of the Securities Act and 21D of the Exchange Act

345.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

346.    Bioventus and Defendants Reali, Singleton, Anglum, and Stalnecker are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 11(f) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these

violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Reali's, Singleton's, Anglum's, and Stalnecker's willful and/or reckless violations of their obligations as officers and/or directors of Bioventus.

347.     Defendants Reali, Singleton, Anglum, and Stalnecker, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Bioventus, including the wrongful acts complained of herein and in the Securities Class Action.

348.     Accordingly, Defendants Reali, Singleton, Anglum, and Stalnecker are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

349.     As such, Bioventus is entitled to receive all appropriate contribution or indemnification from Defendants Reali, Singleton, Anglum, and Stalnecker.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Bioventus, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Bioventus;

(c)     Determining and awarding to Bioventus the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)      Directing Bioventus and the Individual Defendants to take all necessary actions to reform and improve Bioventus's corporate governance and internal procedures to comply with applicable laws and to protect Bioventus and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Bioventus to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding Bioventus restitution from the Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: October 4, 2023

Of Counsel:

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
Email: eitank@bgandg.com

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

*Attorneys for Plaintiff*